DIAMOND COAL AND COKE CO. *v.* UNITED STATES.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 192.   Argued January 28, 29, 1914.—Decided April 6, 1914.

A patent for mineral lands secured under a non-mineral-land law by fraudulently and falsely representing them to be non-mineral, although not void or open to collateral attack, is voidable and may be annulled in a suit by the Government against the patentee or a purchaser with notice of the fraud.

In a suit by the Government to annul a patent, issued under a non-mineral-land law, on the ground that the patent was fraudulently procured for lands known to be mineral, the burden of proof rests upon the Government and must be sustained by that class of evidence which commands respect and that amount of it which produces conviction.

To justify the annulment of a patent issued under a non-mineral-land law as wrongfully covering mineral lands, it must appear that at the time of the proceedings in the land department resulting in the patent the lands were known to be valuable for mineral, for no subsequent discovery of mineral can affect the patent.

In this case the evidence shows with requisite certainty that at the time of the proceedings in the land department resulting in the patents sought to be annulled, the lands were known to be valuable for coal and were sought for that reason.

Where an agent, at the instance and for the benefit of his principal, fraudulently secures patents under a non-mineral-land law for lands

known to be valuable for mineral and then transfers the lands to his principal, the latter is not a *bona fide* purchaser, and the patents may be annulled in a suit by the Government.

There is no fixed rule that lands become valuable for coal only through its actual discovery within their boundaries. On the contrary, they may, and often do, become so through adjacent disclosures and other surrounding or external conditions; and when that question arises, any evidence logically relevant to the issue is admissible, due regard being had to the time to which it must relate. *Colorado Coal & Iron Co.* v. *United States,* 123 U. S. 307, distinguished.

191 Fed. Rep. 786, affirmed.

THE facts, which involve the validity of certain patents for lands entered as non-mineral, but which were known to be chiefly valuable for mineral when entered, and the right, of the Government to have the same annulled as having been fraudulently obtained, are stated in the opinion.

*Mr. Cornelius F. Kelley* and *Mr. L. O. Evans,* with whom *Mr. B. M. Ausherman* was on the brief, for appellant.

*The Solicitor General,* with whom *Mr. Karl W. Kirchwey* was on the brief, for the United States.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This was a suit by the United States, against an incorporated company engaged in coal mining, to regain the title to about 2,840 acres of land in Uinta County, Wyoming, theretofore patented to Thomas Sneddon and Daniel F. Harrison and by them conveyed to the coal company. The patents, thirty-four in number, were issued under the homestead law upon what are called soldiers' additional entries. The applications for the entries were made at various dates beginning with May 1, 1899, and each application was accompanied by an affidavit, by either Sneddon or Harrison, stating that he was

well, acquainted with the land, had passed over it frequently and could testify understandingly about it; that there was not, to his knowledge, any deposit of coal or other valuable mineral within its limits; that it was essentially non-mineral, and that the application was made with the object of securing it for agricultural purposes and not of fraudulently obtaining title to mineral land. Mineral lands, including coal lands, are not subject to acquisition under the homestead law (Rev. Stat., §§ 2302, 2318, 2319, 2347–2351), and these affidavits were made and submitted as proof that the character of the lands applied for was such that they properly could be acquired under that law. The land officers accepted the affidavits and the statements therein as true, and allowed the entries and issued the patents.

The bill charged that the affidavits were false and that the entries and patents were procured in the execution of a fraudulent scheme to acquire known coal lands under soldiers' additional homestead entries; and the decisive issues in the case were, first, whether the lands were known to be valuable for coal when the applications for the entries were made, and, second, if they were, whether the coal company was a *bona fide* purchaser from the patentees. At the hearing the Circuit Court answered the first of these questions in the negative and gave a decree for the coal company; but upon an appeal to the Circuit Court of Appeals that court answered the first question in the affirmative and the second in the negative, and reversed the action of the Circuit Court, with a direction that a decree for the Government be entered. 191 Fed. Rep. 786. The present appeal was then taken by the coal company.

As the arguments of counsel have taken a wide range and in some respects have departed from the settled rules of decision applicable in cases like this, it will be appropriate to restate those rules before turning to the evidence. They are:

1. Questions of fact arising in the administration of the public-land laws, such as whether lands sought to be entered are mineral or non-mineral, are committed to the land officers for determination; and as their decision must rest largely or entirely upon proofs outside the official records, it is possible in *ex parte* proceedings, as was the case here, for applicants, by submitting false proofs, to impose upon those officers and secure entries and patents under one law, when if truthful proofs were submitted the lands could not be acquired under that law but only under another imposing different restrictions upon their disposal. A patent secured by such fraudulent practices, although not void or open to collateral attack, is nevertheless voidable and may be annulled in a suit by the Government against the patentee or a purchaser with notice of the fraud. *Smelting Company* v. *Kemp*, 104 U. S. 636, 640; *United States* v. *Minor*, 114 U. S. 233, 240; *Colorado Coal & Iron Co.* v. *United States*, 123 U. S. 307, 313; *Burfenning* v. *Chicago &c. Railway Co.*, 163 U. S. 321, 323.

2. The respect due to a patent, the presumption that all the preceding steps required by law were duly observed, and the obvious necessity for stability in titles resting upon these official instruments require that in suits to annul them the Government shall bear the burden of proof and shall sustain it by that class of evidence which commands respect and that amount of it which produces conviction. *Maxwell Land Grant Case*, 121 U. S. 325, 379–381; *United States* v. *Iron Silver Mining Co.*, 128 U. S. 673, 676; *United States* v. *Stinson*, 197 U. S. 200, 204–205; *United States* v. *Clark*, 200 U. S. 601, 608.

3. To justify the annulment of a homestead patent as wrongfully covering mineral land, it must appear that at the time of the proceedings which resulted in the patent the land was known to be valuable for mineral; that is to say, it must appear that the known conditions at the time

of those proceedings were plainly such as to engender the belief that the land contained mineral deposits of such quality and in such quantity as would render their extraction profitable and justify expenditures to that end. If at that time the land was not thus known to be valuable for mineral, subsequent discoveries will not affect the patent. The inquiry must be directed to the situation at that time, as were the applicant's proofs and the finding of the land officers. If the proofs were not false then, they cannot be condemned, nor the good faith of the applicant impugned, by reason of any subsequent change in the conditions. "We say 'land *known* at the time to be *valuable* for its minerals,' as there are vast tracts of public land in which minerals of different kinds are found, but not in such quantity as to justify expenditures in the effort to extract them. It is not to such lands that the term 'mineral' in the sense of the statute is applicable. . . . We also say lands *known* at the time of their sale to be thus valuable, in order to avoid any possible conclusion against the validity of titles which may be issued for other kinds of land, in which, years afterwards, rich deposits of mineral may be discovered. It is quite possible that lands settled upon as suitable only for agricultural purposes, entered by the settler and patented by the Government under the preëmption laws, may be found, years after the patent has been issued, to contain valuable minerals. Indeed, this has often happened. We, therefore, use the term *known* to be valuable at the time of sale, to prevent any doubt being cast upon titles to lands afterwards found to be different in their mineral character from what was supposed when the entry of them was made and the patent issued." *Deffeback* v. *Hawke*, 115 U. S. 392, 404; *Colorado Coal & Iron Co.* v. *United States*, 123 U. S. 307, 328; *United States* v. *Iron Silver Mining Co.*, 128 U. S. 673, 683; *Davis* v. *Weibbold*, 139 U. S. 507, 519; *Dower* v. *Richards*, 151 U. S. 658, 663;

*Shaw* v. *Kellogg*, 170 U. S. 312, 332; *United States* v. *Plowman*, 216 U. S. 372, 374.

As a further preliminary to considering the evidence, it should be observed that these lands, if purchased under the coal-land law, would have cost $20 an acre, and also that the coal company could not have purchased directly, or indirectly through others, more than 320 acres, unless it expended $5,000 in opening and improving a mine, in which event the maximum would have been 640 acres. Rev. Stat., §§ 2348, 2350; *United States* v. *Trinidad Coal Co.*, 137 U. S. 160; *United States* v. *Keitel*, 211 U. S. 370. As before said, the entries here in question embraced about 2,840 acres.

Coming to the evidence, we find it voluminous, unreasonably so. Part of it sheds no light upon the issues and was taken in disregard of the last of the rules just stated. That which properly may be considered very clearly establishes the following facts:

The proceedings in the land office began in May, 1899. Most of the applications were filed during that year and passed to patent in 1901. The others were presented and acted upon in succeeding years. The patents were all secured by means of affidavits and proofs, as before indicated, declaring that the lands were essentially nonmineral, were not known to contain any deposit of coal, and were sought for agricultural purposes and not as mineral land. For many years the district in which the lands were situate had been known to contain coal. They were surveyed in 1874, and the surveyor reported one of the sections as coal land, the others being contiguous to lands similarly reported. This was shown in the field notes and upon the official plats. The lands were in a valley, three or four miles in width, bounded on the east and west by foot-hills. A thick bed of coal was disclosed in the eastern face of the western hills, but its quality was not such as to make it of commercial value. Along

the western base of the eastern hills was the outcrop of
another coal bed. This outcrop had been weathered
down and in some places covered by the wash from above,
but it could be traced upon the surface for several miles.
It had been opened up at different places, and the openings
disclosed a coal bed, from six to fourteen feet in thickness,
dipping to the west at an angle of from fifteen to twenty-
five degrees from the horizontal, as did the Cretaceous
rocks with which it was interstratified. This coal was of
superior quality and recognized commercial value, and
the rocks containing it were the coal-bearing strata of that
region. The lands in controversy were west of the out-
crop, in the direction of the dip. Some were near the
outcrop and the east line of the farthest section was
about a mile and a half away. There was nothing upon
their surface showing the presence of coal beneath, nor
anything indicating that the bed outcropping on the east
and dipping to the west did not pass through them. Un-
less valuable for coal, they were not worth to exceed a
dollar and a quarter an acre. They were arid sagebrush
lands, about 7,000 feet above sea level, and afforded very
limited pasturage. Without irrigation they were not
susceptible of cultivation, and the cost of securing water
for that purpose was prohibitive.

Attracted by this outcrop, the coal company opened a
mine thereon, in the vicinity of these lands, in 1894. In
the beginning the output of the mine was small, but it
reached 183,750 tons for 1897, 259,608 tons for 1898, and
441,277 tons for 1899.

An attempt was made by the coal company to acquire
a part of the lands in controversy in 1898 by inducing
some of its employés and others to make ordinary home-
stead entries of them under an agreement whereby the
company was to bear the expense, compensate the entry-
men for the exercise of their homestead rights, and receive
the title when perfected. The arrangement was fraudulent

and in direct violation of the homestead law, independently of the character of the lands. 26 Stat. 1095, 1097, c. 561, § 5. Sneddon was in charge of the attempt. He was acquainted with the lands and all their surroundings and was well informed upon the subject of coal mining. With the aid of a surveyor he identified the subdivisions to be entered, and afterwards selected the men who were to make the entries and directed all that was done, indicating, in that connection, that the lands were coal lands and were to be taken for that reason, and also to prevent another coal concern from getting them. The entries were made in 160-acre tracts, and to give them apparent support cheap cabins were put upon the lands, at the company's expense, but the law was not even colorably complied with in other respects. The next year this plan was abandoned and that of using soldiers' additional rights was adopted. These rights were assignable, and in their exercise no residence, improvement or cultivation was required. See Rev. Stat., § 2306; *Webster* v. *Luther*, 163 U. S. 331. At the company's request the prior entries were relinquished and the entrymen were severally paid $500 for what they had done, the payment to one being $600. When the relinquishments were filed, Sneddon and Harrison immediately applied to enter the lands with soldiers' additional rights. A few of the relinquished subdivisions were not reëntered, and several tracts not covered by the prior entries were included in the new ones, but all of the latter were made with soldiers' additional rights purchased and supplied by the company and were made for its benefit. The price paid by the company for these additional rights was from six to thirteen dollars an acre. After the entries were obtained the lands were conveyed to the company, and Sneddon was paid $1,000 for this service, although otherwise regularly employed by the company at the time.

In 1898, shortly before the dummy entries were made,

Sneddon had filed in the land office a sworn declaration of his intention to purchase, under the coal-land law (Rev. Stat., §§ 2347–2349), one of the tracts in controversy, which he then described as containing "a valuable vein of coal." The tract was about a quarter of a mile from the outcrop. At the time of making the soldiers' additional entries he relinquished the coal filing and included the tract in two of them.

In 1899, about the time of the additional entries, James Lees purchased from the Government, under the coal-land law, and sold to the company for $3,400, a quarter section upon which earlier exploration had disclosed good coal, eight feet in thickness. This sale was in execution of a prior arrangement and the price paid to Lees was $200 in excess of that paid to the Government. The tract was within a half mile in each of three directions from lands here in controversy.

As indicative of the weight and importance which men having a practical knowledge of coal mining attached to the outcrop at the time, the Government proved by an experienced mine foreman, who had been in charge of large mines, known as the Cumberland, adjacent to a portion of the lands in controversy, that those mines were opened in 1900 by reason of what was found on the outcrop; that there was no precedent drilling of the adjacent lands; and that in advising the opening of the mines he was guided by what an examination of the outcrop in 1889 disclosed. True, he said that he could not take "a solemn oath" or "be positive" that unexplored lands in the vicinity of the outcrop and in the direction of the dip contained valuable coal, but his testimony was plainly to the effect that the outcrop, the direction and inclination of the dip, and other conditions in 1899 and 1900 afforded reasonable ground for believing that a considerable territory lying west of the outcrop could be mined profitably.

There was much expert testimony by geologists concerning the outcrop and other known geological data bearing upon the character of these lands. In the main the witnesses were agreed respecting the existence of these physical indicia, but differed as to the conclusions to be drawn from them, the expert for the Government maintaining that they afforded convincing reasons for concluding that the lands were coal lands and the experts for the coal company controverting that view. But the divergence was not so pronounced as it would seem, for it was partly due to a difference as to what, in legal contemplation, are coal lands.

The expert for the Government proceeded upon the theory that when the known surroundings are such that practical coal men would invest in particular lands for coal mining, or advise others to do so, those lands are to be deemed coal lands, even though coal has not as yet actually been disclosed within their limits. And having in mind the outcropping coal bed, the direction and inclination of its dip, the character of the rocks with which it was interstratified, the quality and thickness of the coal at the outcrop, the proximity of the lands to the outcrop, and the topographical and structural features of the vicinity, he gave it as his opinion that the coal bed extended into and through the lands in question and that practical coal men would regard the lands as valuable for coal and invest in them as such. He accordingly pronounced them coal lands within his acceptation of that term. This conclusion had substantial support, not only in the facts already recited, but also in the fact that the company's maps, made three years before the suit was begun, showed that it was intending to project its mining operations westward from the outcrop a mile and a half and had designated the intervening lands, which included some of those in controversy, as coal lands, and in the further fact that the company had returned lands extending west-

ward a similar distance, likewise including some now in controversy, as exempt from direct taxation by reason of a local statute substituting an output tax upon coal mines. Laws Wyo. 1903, c. 81, p. 101. The return for the year in which the maps were made claimed an exemption of substantially six sections, in two tiers of three sections each, although the work of developing the mine (No. 4), as shown by the maps, was still within the east half of the middle section in the eastern tier.

The experts for the coal company proceeded largely, but not entirely, upon the theory that lands cannot be regarded as coal lands unless coal in quantity and of quality to render its extraction profitable is actually disclosed within their boundaries. One testified that even if a slope were driven from the outcrop to within five feet of the vertical boundary of one of the sections in question, and in good coal all the way (a fact proved but not to be considered here, because in the nature of a discovery subsequent to the entries), it would not show that the section approached was coal land, there being no actual exposure of coal within its limits. And he added that it would be the same if the distance were three inches instead of five feet, but that "the moment you cross the line, then it commences to be coal land." Special emphasis was laid upon the uncertainties incident to coal mining in the Cretaceous areas of the West by reason of the occurrence of faults, wants, thinning and the like, and this, it was said, required that actual exposure of coal within the land, by an outcropping at the surface or an excavation, be accepted as the true and only test. But even such a test was largely discredited by statements that "a good outcrop at the surface may represent a want below, or a want at the surface may represent a coal below," and that in following a good discovery a fault or thinning, as well as a want, may be encountered at any moment. It was conceded, however, that the coal horizon—meaning the coal-

bearing strata shown at the outcrop, but not necessarily the coal—passed through the lands in controversy, and one expert, while declaring that he could not make an affidavit that they were coal lands in the sense of "strictly containing deposits of coal," candidly added: "But I would be prepared to make an affidavit that I believe them to contain coal." Another, although pronouncing the showing at the outcrop and elsewhere insufficient to render the lands valuable for coal mining, said: "I am not prepared, personally, to either affirm or deny that this land does or does not contain coal. I contend that it is beyond the capacity of any man to say that something exists or does not exist upon which he has no absolute testimony."

It is of some significance that Sneddon—who had long been in the company's service, had been the central figure in the acquisition of these lands, was familiar with them and the purpose for which they were sought and acquired, was the company's superintendent when the evidence was taken before the master, and was present during a part, at least, of the time when it was being taken—was not called by the company as a witness, and that statements, declarations and acts attributed to him and which made against the company were permitted to go undenied and unexplained.

We think the evidence, rightly considered, shows with the requisite certainty that at the time of the proceedings in the land office the lands were known to be valuable for coal. Otherwise they had only a nominal value, not to exceed one dollar and a quarter an acre, and yet easily ten times that amount was voluntarily expended by the company in acquiring them. It was hardly intending to make an aimless or grossly excessive expenditure. It was a practical concern, operated by practical men. It had located a mine upon the outcrop five years before, and in the meantime had proved the wisdom of the undertak-

ing by its mining operations.   They had disclosed the
existence of an extensive bed of valuable coal dipping to
the west under the valley, and in that way had supple-
mented the evidence afforded by the outcrop and its sur-
roundings.   Without any doubt these considerations in-
duced the company to believe, and rightly so, that the
lands in controversy possessed a value for coal mining
greatly in excess of their value for any other purpose.
This explains the expenditure and the persistency of the
company's efforts to acquire them; and the fact that the
earlier effort was obviously fraudulent and unlawful,
independently of the character of the lands, serves in no
small degree to explain the kindred practices employed in
the later effort.   In short, the company, without care as
to the means, sought and acquired the lands because it
regarded them as valuable for coal.   Its view and purpose
were also reflected by its maps and tax returns.   Of course,
it was not a *bona fide* purchaser from Sneddon and Harri-
son, for they were mere agents representing it as an undis-
closed principal.

An exposure to the eye of coal upon the particular lands
was not essential to give them a then present value for
coal mining.   They were all adjacent to the outcrop and
above the plane of the coal-bearing strata dipping under
the valley.   In alternate even-numbered sections they
substantially paralleled the outcrop for seven miles, and
in two places were separated from it by only a few rods.
Those to the north were opposite the company's developed
mine (No. 4), and those to the south were opposite the
tract acquired through Lees, upon which good coal was
disclosed.   The outcrop, the disclosures in the vicinity,
and the geological formation pointed with convincing
force to a workable bed of merchantable coal extending
under the valley and penetrating these lands.   These con-
ditions were open to common observation, and were such
as would appeal to practical men and be relied upon by

them in making investments for coal mining. They did so appeal to the Cumberland people, as well as this company, both large concerns represented by men of experience, understanding the uncertainties and hazards of the business as well as its rewards. No doubt it has its uncertainties and hazards, but the evidence shows that they are not so pronounced as indicated by the company's experts.

There is no fixed rule that lands become valuable for coal only through its actual discovery within their boundaries. On the contrary, they may, and often do, become so through adjacent disclosures and other surrounding or external conditions; and when that question arises in cases such as this, any evidence logically relevant to the issue is admissible, due regard being had to the time to which it must relate.

The case of *Colorado Coal & Iron Co.* v. *United States*, 123 U. S. 307, relied upon by the coal company, is essentially different from this in that there the court was dealing with a statute excepting from entry lands on which there were "mines" at the time, a matter particularly noticed in the opinion (p. 328), while here the exception is of "mineral lands" and "lands valuable for minerals." Rev. Stat., §§ 2302, 2318.

It will be perceived that we are not here concerned with a mere outcropping of coal with nothing pointing persuasively to its quality, extent or value; neither are we considering other minerals whose mode of deposition and situation in the earth are so irregular or otherwise unlike coal as to require that they be dealt with along other lines.

*Decree affirmed.*