## UNITED STATES v. PETERSON et al.

### (Circuit Court of Appeals, Ninth Circuit.   February 15, 1915.)

### No. 2414.

PUBLIC LANDS ⬦120 — CANCELLATION OF PATENTS — SUFFICIENCY OF EVIDENCE.

In a suit to cancel a patent to land which the patentee conveyed to defendant, on the ground that the patentee in filing on the land and obtaining a patent was acting for defendant, evidence *held* sufficient to sustain the burden of proof resting upon the government, and to entitle it to a decree canceling the patent.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332–335; Dec. Dig. ⬦120.

Cancellation of patent, see note to Hartman v. Warren, 22 C. C. A. 38.]

Appeal from the District Court of the United States for the District of Montana; George M. Bourquin, Judge.

Suit by the United States against Jennie Peterson (formerly Jennie Benedict) and others.   From a decree dismissing the bill of complaint, the United States appeals.   Reversed and remanded, with instructions.

Burton K. Wheeler, U. S. Atty., and Frank H. Woody, Jr., Asst. U. S. Atty., both of Butte, Mont., for the United States.

Cooper & Stephenson, of Great Falls, Mont., for appellees Albright.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge.   The United States appeals from a decree dismissing its bill of complaint in a suit brought against the appellees to set aside and cancel, on the ground of fraud, a patent issued to Jennie Peterson for 160 acres of land in the state of Montana.

The testimony of Jennie Peterson was, in substance, as follows: She had been working in Montana for the defendant William H. Albright before she was of age, and had said that when she got old enough she would like to take up a ranch.   Thereafter she returned to reside with her mother in Michigan.   While there, in the spring of 1901, Albright wrote to her and said that he understood that she wanted to come West again, that she was old enough, and could file on a homestead, that he had a piece of land in view, and, if she decided to come West again, to let him know and he would send her a ticket.   She answered his letter, and he sent her a ticket, which she used.   She left Michigan July 5, 1901, and went to Great Falls.   She had written to Albright, telling him about the time she would leave Michigan.   He met her in Great Falls, and told her that the papers were ready in Prior's office.   She thereupon filed on her homestead. She had not been on the land, and did not know where it was located. She did not direct Prior to prepare the papers, and had nothing to do with the preparation of the homestead filing, nor did she pay the filing fees, or know who paid them.   She discussed with Albright what she was to receive for the land when she proved up on it.   The

understanding was that she was to commute and prove up at the end of 14 months, and was to receive $640, "or the same as the rest of them would receive for their homestead right.". By "the rest of them" she meant Peter Carter, August Enger, Hermann, Oliver, "and a few more." Albright told her that she was to receive the same as the rest of them that took up homesteads. She understood that was for $640. Albright was to pay the expenses. He built her house for her. After making the entry, a part of the time she worked for Albright, and part of the time she lived on her homestead. In the early spring of 1902 she visited the ranch. She had nothing to do with the building of the cabin. While she lived on the ranch, Albright furnished her provisions, as it was a part of the agreement that he was to pay all expenses. She never paid out anything for expenses in the way of improvements. She could not state who did the labor, but thought Peter Parker and Gustav Hermann put up the cabin. She submitted final proof on August 11, 1905. Albright gave her money to pay the expenses of the witnesses. On making proof she answered the questions just as Albright told her to. He had furnished her with a copy of the questions. She did not pay the filing fees, or the fees on final proof. She commuted, and Albright gave her the money. After she got the filing receipt, she transferred it to Mrs. Albright, under Albright's direction. She received $650 for the land, $500 in a note of Albright, and $150 either in cash or by check. After making the entry on her homestead, she had had her homestead filing changed so to embrace some desert land which had been in the possession of one Lavelle, who relinquished the same at Albright's instance. She further testified that, on making final proof, Albright told her not to say anything about his arrangement with her. At that time she had no property except a horse. Albright told her they might ask her if she had any stock. He told her he would give her a bill of sale for two cows, which he did. After she came out of the land office, she handed the bill of sale back to Albright.

Peter Carter testified that he had been employed by Albright, that he filed on a homestead near Albright's quarry, and that he had an agreement to transfer the property to Albright prior to the time when he filed. He said:

"I was to file on the land, and he would pay the expense. When I acquired title, I was to transfer it to him."

And he testified that after he made his final proof, and received his final certificate, he sold it to Albright for $640.

Frank C. Whittaker testified that he had worked for Albright, and was working with him "as partner on things" for six or seven years, and was interested with him in some mining claims in 1901; that Albright and Mrs. Albright talked to him about getting Jennie Peterson to take up some land. "We three talked it over, and thought it would be a good thing to get her to come out and take up land for Mrs. Albright. Albright suggested that he would send her a ticket to come, and some money for expenses. Mrs. Albright thought it would be all right to have her come and keep books and take up some land," and he testified that before she came he and Albright staked and meas-

ured out the land for her claim, and put up three or four rock* in place, so that they would know where it was, and set some sta·es thereon. He testified that there was a difference made in her c·se from that of some other people who had taken up land and sold to Albright. "Before she got a patent, she was to get the same as the rest, $640—$440 clear, and he would furnish the money to commute with; that if she would stay on the land five years, and not commut·, he would give her $750." He testified that Albright built the improve· ments on her place; that on one occasion Jennie Peterson went up to her homestead to stay several weeks, and Mrs. Albright told her to take provisions out of the kitchen, and that he (Whittaker) was sent up there once so that he could be a witness; that he saw her living on the land, and took her some provisions.

Charles Gustafson testified that he had a conversation with Albright, in which Albright told him that Jennie Peterson was coming "out there to take up land for him"; and he testified that Jennie Peterson told him in the fall of 1901 that she had taken up the land for Albright.

Mrs. Gustafson testified that Albright told her:

"We let that girl take up a homestead for us just to help her out, by work- ing in the office and holding land there, so it gives her a show to make money in two places."

And the witness added:

"It was common talk with every one that the homesteads up there were for Mr. and Mrs. Albright."

Albright denied much of the testimony of the other witnesses. He denied that he sent Jennie Peterson a ticket, or that he met her at Great Falls, or took her to Prior's office. He testified that after she came out from Michigan he went over the land with her, and he described the method in which he arrived at the common corners of sections 35, 36, 25, and 26, "and then stepped back 440 steps, about a quarter of a mile, and made a point there, and we were on every 40. She told me she had to be on every 40." He said:

"I probably went to Great Falls with her when she made her filing. No doubt I did; but I didn't pay the filing fee, or the expense of building her cabin."

On cross-examination, he testified:

"I came to Great Falls with her when she made her homestead entry. I often had some business in Great Falls."

He testified that Hermann built a cabin on the homestead; that Hermann said to him, "I want to build Jennie's house;" and as corroborating his testimony, he pointed to his time book, which show- ed that Hermann was not working for him at the quarry from De- cember 6 to December 27, 1901. He denied that he paid the ex- penses of final proof, or of the improvements, or of the cultivation of the land. He testified that he paid Jennie Peterson $800 for her claim, $150 in cash, $150 in check, and $500 by note. He testified that Jennie Peterson had told him she wanted some fencing done on her

claim, and asked him how much it would be, and when it was figured up it amounted to $110, so he said to her:

"'All right, you pay me, and I will get your fencing and put it up.' I constructed the fence on the Jennie Peterson claim, and she paid me for it."

Mrs. Albright testified:

"I don't think there was any agreement existing between her (Jennie Peterson) and Mr. Albright that she was holding the homestead for him."

The court below, while entertaining the opinion that the testimony served to arouse suspicion, and even preponderated in favor of the complainant, held that it fell short of the "high degree of proof" the government must produce to warrant cancellation of its executed contract, its patent and grant of title, and pointed to the fact that there were no circumstances to corroborate Mrs. Peterson, "that the ticket and letters, etc., rested on her testimony alone," and the court added:

"Albright's books are inconsistent with her testimony that he paid all her expenses on the land."

We find nothing incredible in the testimony of Jennie Peterson. Her testimony was given some 10 years after the date when she filed on her homestead, and it is not a suspicious circumstance that she had failed to preserve the letters which she testified Albright wrote her prior to her entry. As to his sending the ticket on which she came West, it is not pointed out how she possibly could have corroborated her testimony. What motive could she and the other witnesses have had to testify falsely against the Albrights? It does not appear, and Albright does not testify, that there was any misunderstanding or ill feeling between Jennie Peterson and himself until after she had stated the facts in regard to her homestead to one Bennett, shortly before the suit was begun. "There was no hard feelings between Mr. Albright and me until this case came up," said Jennie Peterson. But after the suit was begun, she testified, she had a conversation with Albright in which—

"Mr. Albright said I was in for it, and wanted to know what I was going to do about it. I said I was going to tell the truth; and he told me I might get 20 years in the penitentiary if I said I took it up for his benefit, because I swore I took it up for my own benefit. * * * He told me to do the right thing when I testified. I don't know what he meant by the right thing. He didn't explain. He said he would make me a present. He said I must testify that I didn't take it up for him, and he didn't make any bargain with anybody."

She went on to say that at that time he abused her shamefully, and added:

"The reason he talked that way was because his attorney discovered I put my name on this paper for Mr. Bennett. That was what the trouble started over."

According to Albright's testimony, he had had trouble with all the witnesses who testified against him, and Mrs. Peterson had tried to get blood money out of him, to hold him up for $1,000. He said:

"Jennie Peterson went around the kitchen, in the back way, and came to the hall, and says, 'Have you got anybody hid here?' I said, 'What do I want

to hide anybody for?' Then she said that, if I didn't give her $1,000, she, Frank Whittaker, and Charley Gustafson would swear me to the pen by a preponderance of the evidence."

He testified:

That Carter "fired a rock at him," and that Whittaker was "pretty crooked —dog-gone crooked"; that Whittaker drew a gun on him on April 27, 1910. "As I went to the table to get breakfast, he jumped from behind the door, and stuck the gun in my face. He said, 'Throw up your hands.' I flew upstairs. I didn't have a gun."

He furnished no explanation of the motive or provocation of these melodramatic acts of Peterson, Carter, and Whittaker, and the nature of the incidents described, and the manner in which they are narrated, carry the suggestion that their source is fictional.

We are unable to agree with the court below that Albright's books are inconsistent with Jennie Peterson's statement that he paid all her expenses on the land. The only books which Albright produced in evidence was his timebook. The daybook, which would have shown the nature of his transactions with Jennie Peterson, was not produced, nor was its absence accounted for, further than by Albright's statement: "I haven't got the daybook, and I don't know where it is." The timebook contained entries of the time of various employés of Albright, and charges of money entered against such employés from time to time. There is nothing but Albright's own testimony to show what those charges were for, whether for money paid for wages, or for groceries and goods supplied, or for services. One of the charges against Jennie Peterson is $110. Albright testified that that was for fences which he built on her homestead at her request. But the entry itself does not show that it may not have been for wages which she earned in his employment, as she was admittedly working for him as bookkeeper in his office during a large part of the time while she was residing upon her homestead. Albright pointed to entries of his timebook showing that Hermann was not working for him from December 6 to December 27, 1901, for the purpose of proving that Hermann was not in his employment while he was building the cabin on the Peterson claim. But in his answer to the bill of complaint Albright alleged that Jennie Peterson established her residence upon the lands aforesaid on or about the month of October, 1901, and in the homestead proof, made by Jennie Peterson in 1905, she deposed that the house was built in October, 1901. In short, the timebook adds neither strength nor corroboration to Albright's testimony.

Nor are we able to agree with the court below that the evidence is not of that high character which is required in order to set aside a patent for fraud. The latest expression of the views of the Supreme Court as to the nature of the evidence which is called for in that class of cases is found in Diamond Coal Co. v. United States, 233 U. S. 236, 34 Sup. Ct. 507, 58 L. Ed. 936, in which the court said:

"The respect due to a patent, the presumption that all preceding steps required by law were duly observed, and the obvious necessity for stability in titles resting upon these official instruments, require that in suits to annul them the government shall bear the burden of proof, and shall sustain it by that class of evidence which commands respect and that amount of it which produces conviction."

220 F.—39

We think in the case at bar the government has met the burden of proof by a class of evidence which is entitled to respect and is convincing. The evidence wholly fails to establish the defense that Mrs. Albright was an innocent purchaser for value.

The decree is reversed, and the cause is remanded, with instructions to enter a decree for the appellant.