**UNITED STATES v. CHARLESTON, S. C., MINING & MFG. CO. et al.**

(District Court, S. D. Florida.   May 5, 1924.)

No. 50.

1. **Public lands ⬅⮞52—Florida held not entitled to select mineral lands in lieu of school lands lost.**
   The state of Florida had no right, under Act March 3, 1845, to select phosphate lands in-lieu of school lands lost.

2. **Evidence ⬅⮞161(1)—Letter best evidence of contents.**
   A letter in possession of opposing party is best evidence of contents, and notice to produce should be given before attempt to prove contents by oral testimony.

3. **Evidence ⬅⮞244(2)—Testimony as to conversation with officer of corporate party admissible.**
   One may testify as to conversations with vice president of corporate party.

4. **Trial ⬅⮞96—Motion to exclude properly denied, where part of evidence admissible.**
   Where some of testimony given by witness is admissible, a motion to exclude all of his evidence must be denied.

⬅⮞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. Public lands ⬤⇒120—Evidence held to show knowledge of mineral character of land.**

> In suit to set aside approval of Secretary of Interior of selections of land made by state of lands in lieu of school lands, evidence *held* to show that defendant, grantee of state, who procured divesting of title of United States, had reason to believe that land was most valuable for phosphate deposits.

In Equity. Bill by the United States against the Charleston, S. C., Mining & Manufacturing Company and others. Decree for the United States.

Wm. M. Gober, U. S. Atty., of Tampa, Fla., and Harry W. Reinstine, Asst. U. S. Atty., of Jacksonville, Fla.

Hampton & Hampton, of Gainesville, Fla. (Wilson & Swearingen, of Bartow, Fla., on the brief), for defendants.

CALL, District Judge. On October 13, 1914, the complainant filed its bill to set aside the approval of the Secretary of the Interior of certain selections of land made by the state of Florida for lands in lieu of school lands granted to the state of Florida by act of Congress (Act March 3, 1845, 5 Stat. 788 c. 75), and declare the title void derived from the state under such approved lists by the defendant to the east half of the southwest quarter and the northwest quarter of the southeast quarter of section 19, and the north half of the northwest quarter, the north half of the southwest quarter, and the southeast quarter of the southeast quarter of section 30, all in township 32 south, range 26 east of the Tallahassee meridian, chiefly valuable for phosphate deposits thereon. The ground for relief prayed is that the defendant perpetrated a fraud upon the officers of the government in procuring the approval of the lists under which the title to the particular lands was divested out of the United States and vested in the defendant through the deed from the board of education of the state.

The defendant answered the bill, denying that it had been guilty of the fraud alleged, and putting in issue the fact that the lands were chiefly valuable on account of the phosphate deposits upon them. The defendant also alleged that a trust company was a necessary party, by reason of a deed of trust, executed to secure the payment of a bond issue, covering these particular lands, with others. Testimony was taken and a decree entered September 6, 1916. From this decree the defendant sued out an appeal to the Circuit Court of Appeals, which court reversed the decree of the lower court, because the trust company, trustee under the deed of trust, was not made a party, and remanded the cause. 246 Fed. 828, 159 C. C. A. 130.

[1] Thereupon the trust company was made a party defendant and answered the bill. The parties, by stipulation, in order to save expense of retaking the testimony, agreed that the testimony theretofore taken should be reintroduced, subject to objections which might be made as to its admissibility, and only a small amount of additional testimony was taken by the defendant. Prior to the present hearing the deed of trust was satisfied, and, the trust company thus becoming an unneces-

sary party, an order of dismissal was obtained as to it. At the hearing the defendant asked leave to amend its answer, which was granted, and the amendment made. This amendment raises the question whether the state of Florida had the right, under the Act of March 3, 1845, granting the sixteenth section in each township to the state for school purposes, to select phosphate lands in lieu of school lands lost; the contention of the defendant being that the act granted to the state every sixteenth section, whether mineral or purely agricultural, and in case of loss the state had the right to select from vacant lands of the United States other lands, without reference to the character of the land selected. On the argument I was much impressed by this contention, but after carefully considering the case of United States v. Sweet, Adm'r, 245 U. S. 563, 38 Sup. Ct. 193, 62 L. Ed. 473, and applying the principle announced in that case, I am of opinion that such contention is untenable. Mr. Justice Van Devanter, on page 567 (38 Sup. Ct. 193), uses this language:

"In the legislation concerning the public lands it has been the practice of Congress to make a distinction between mineral lands and other lands, to deal with them along different lines, and to withhold mineral lands from disposal save under laws specially including them. This practice began with the Ordinance of May 20, 1785, 10 Journals of Congress (Folwell's Ed.) 118, and was observed with such persistency in the early land laws as to lead this court to say, in United States v. Gratiot, 14 Pet. 526: 'It has been the policy of the government at all times, in disposing of the public lands, to reserve the mines for the use of the United States,' and also to hold in United States v. Gear, 3 How. 120, that an act making no mention of lead mine lands, and providing generally for the sale of 'all the lands' in certain new land districts, 'reserving only' designated tracts, 'any law of Congress heretofore existing to the contrary notwithstanding,' could not be regarded as disclosing a purpose on the part of Congress to depart from 'the policy which had governed its legislation in respect to lead mine lands,' and so did not embrace them. A like practice prevailed in respect of saline lands, and in Morton v. Nebraska, 21 Wall. 660, where a disposal of such lands * * * in certain territories was drawn in question, this court said that it could not be supposed, 'without an express declaration to that effect,' that Congress intended by such an act to permit the sale of saline lands and thus depart from 'a long-established policy by which it had been governed in similar cases.'"

The language of the act is broad enough to cover mineral lands, were it not for the policy of Congress as determined by the acts. The acts showing this policy are referred to by the Supreme Court in a footnote at the bottom of page 668, covering the period from 1796 to 1841, prior to the grant of lands to Florida. The act of 1845 does not indicate an intention on the part of the Congress to include mineral lands. Under the principle announced by the court in the above case it can make no difference that the act refers to some concession made by the state.

[2] The defendant at the hearing moved the court to sustain objections to testimony as set forth in its motion. The first five objections and motions to strike refer to the testimony of the witness Childers as to contents of written communications to Crenshaw, one of the officers of defendant, concerning the lands in sections 19 and 20. While the orderly procedure would have been to give notice to defendant to produce the documents, before attempting to give in evidence the contents

by oral·testimony, yet in this case I do not think the testimony damaged the defendant to any extent. The only effect of such testimony was to show the witness had opened a correspondence with Crenshaw with a view of interesting the defendant in the lands. The decision of the question involved in the case would not, in the view I take of the case, be affected. However, the objections are well taken and the motions will be granted.

[3, 4] The sixth motion refers to the evidence of Childers as to conversations with Chisolm. This objection would be well taken, were it not that Chisolm testified that he was a vice president of the defendant. The seventh motion goes to the weight to be attached to Childers' testimony, not to its admissibility. The eighth is as to all of the testimony of Childers. Some of the testimony given by this witness was admissible, and this motion must be denied. The ninth motion is as to the map. Exhibit B. This motion will be denied. ✓

The tenth, eleventh, twelfth, thirteenth, fourteenth, and fifteenth motions are directed to testimony of different witnesses who testified ,to examinations of the lands, analysis of the phosphate rock, found on the land after suit was brought. One of the issues in the case was whether the lands contained phosphate, and were chiefly valuable as phosphate lands. The testimony objected to was admissible to sustain this issue. The sixteenth motion is as to the testimony taken to show the interest of the trust company. This motion is granted. The motions numbered 1, 2, 3, 4, 5, and 16, will be granted.

[5] There are two issues to be tried in this case. First. Is the land most valuable for the phosphate deposits on the land? This question, it seems to me, must be answered in the affirmative as to lands described in the bill, except the southeast quarter of the southeast quarter of section 30. There is no testimony to show phosphate deposits on that portion of the section.

The second issue is: Did the defendant know or have good reason to believe the lands were most valuable for the phosphate deposits upon them, and were they acquired for that reason? Taking into consideration the business of the defendant; that Capt. Singleton was its agent on the ground, prospecting for phosphate, recommending lands to his principal for purchase; the circumstances of the inauguration of steps by which these lands were acquired; the very small price paid for these lands as compared to the price paid for lands acquired by the defendant in the neighborhood of these lands; the view of others in that neighborhood as to the character of these lands—it impresses me that this defendant must have been cognizant of the condition of the lands before purchasing them. If it was, then it was a fraud upon the United States to thus procure the divesting of the title of the United States. Why should Capt. Singleton have gone to Stewart·in the first instance, when his communication to Hampton would have accomplished the same results, unless possibly Mr. Hampton might have been cognizant of his connection with defendant, and thus brought about an examination of the land which would have shown whether it was mineral or not, instead of riding over the lands with the witness who made the affidavit that the land was nonmineral, when Singleton knew such an examination

was absolutely worthless to show whether the lands contained phosphate. Why conceal the fact from Hampton that the defendant was the interested party?

The principles announced in Diamond Coal Co. v. United States, 233 U. S. 236, 34 Sup. Ct. 507, 58 L. Ed. 936, when applied to the evidence in this case, is decisive of the question here involved. The evidence is rather voluminous, and I have not attempted a discussion of it; but from a careful consideration of all of it, except that of Childers in reference to the contents of letters he said he had written, I feel constrained to find that complainant should have a decree as prayed, to all the lands described, except the southeast quarter of the southeast quarter of section 30.

It will be so decreed.