UNITED STATES v. SOUTHERN PAC. R. CO. et al.

(District Court, S. D. California, S. D. March 3, 1926.)

No. 97.

**1. Limitation of actions ⬤⟫100(10)—Rule that limitations do not commence to run until discovery of fraud applies in actions by government to annul land patents (Act March 3, 1891 [Comp. St. § 5114]).**

Equitable rule that, as affects running of limitations cause of action does not accrue until discovery of fraud, where there have been acts of concealment, applies in actions by government to annul land patents instituted after time allowed therefor by Act March 3, 1891 (Comp. St. § 5114).

**2. Public lands ⬤⟫120—Government held entitled to rely on affidavits land granted to railroad did not contain minerals (Act July 27, 1866 [14 Stat. 292]).**

Government held entitled to rely on statements in affidavits furnished by railroad that lands granted to it under Act July 27, 1866, did not contain interdicted minerals, until notified to contrary.

**3. Limitation of actions ⬤⟫100(3)—Action to annul patents, instituted within six years after discovery of alleged fraud, held maintainable, notwithstanding statute of limitations (Act July 27, 1866 [14 Stat. 292]; Act March 3, 1891 [Comp. St. § 5114]).**

Action by government to annul land patents issued to railroad under Act July 27, 1866, instituted within six years after discovery of alleged fraud in procurement of such patents, held maintainable notwithstanding Act March 3, 1891 (Comp. St. § 5114), requiring such actions to be brought within six years after issuance of patent.

**4. Public lands ⬤⟫120—Evidence as to mineral character of land and fraud of railroad held to warrant annulment of patent (Act July 27, 1866 [14 Stat. 292]).**

Evidence as to mineral character of land and as to railroad's alleged fraud in procurement of patent thereto under Act July 27, 1866, held to warrant annulment of patent as to one quarter section only.

**5. Public lands ⬤⟫120—Lessee of railroad quarrying lime rock from land granted held not liable for rock removed on annulment of patent (Act July 27, 1866 [14 Stat. 292]).**

Lessee, quarrying lime rock from land granted railroad under Act July 27, 1866, more than eight years previously, as nonmineral, on annulment of patent in suit by government, held not liable for rock which it had in good faith removed.

**6. Public lands ⬤⟫120—Railroad, on annulment of patent, held liable for rentals and royalties received from lessee quarrying lime rock and for proceeds from sale of part of land (Act July 27, 1866 [14 Stat. 292]).**

Railroad, found to have fraudulently obtained patent under Act July 27, 1866, to mineral land containing lime rock, held liable for royalties and rentals received from lessee quarrying such rock, and for proceeds of sale of part of land on annulment of patent in action by government.

In Equity. Suit by the United States against the Southern Pacific Railroad Company and others. Decree for the United States.

Joseph C. Burke, U. S. Dist. Atty., of Los Angeles, Cal., and George A. H. Fraser, Sp. Asst. Atty. Gen.

Frank Thunen, of San Francisco, Cal., for defendants Southern Pac. R. Co., Southern Pacific Land Co., Central Trust Co. of New York, Equitable Trust Co. of New York, Homer S. King, and James K. Wilson.

Joline, Larkin & Rathbone, of New York City, for Central Union Trust Co. of New York (sued herein as Central Trust Co. of New York).

Murray, Prentice & Howland, of New York City, for Equitable Trust Co. of New York.

Arvin B. Shaw, Jr., and I. W. Stewart, both of Los Angeles, Cal., for defendant Sugar Lime Rock Co.

JAMES, District Judge. This is an action in equity to cancel a patent to land described as section 13 in township 11 north, range 6 east S. B. B. & M. Damages are also prayed for. Patent was issued to Southern Pacific Railroad Company pursuant to the provisions of the act of grant of July 27, 1866 (14 Stat. 292). The Southern Pacific Land Company holds legal title to the land covered by the patent. The land company is of the same ownership as the Southern Pacific Railroad Company, acts as a subsidiary of the former, and occupies no position in this action which would entitle it to assert any of the rights of an innocent transferee. All of the other defendants named, except the Sugar Lime Rock Company, are trustees holding security property of the two defendants first named. The Sugar Lime Rock Company, under lease contract made on June 5, 1914, took lime rock from a quarry in the northwest quarter of the section. This com-

pany is made a defendant because the government seeks to recover damages on account of the removal of that rock from the land.

By the terms of the act referred to there was granted to the railroad company sections of odd numbers, to the amount of "ten alternate sections of land per mile on each side of said railroad." "Mineral" lands were excluded. It was provided that in place of mineral lands there might be patented unappropriated agricultural lands. It was declared by the act that the word "mineral," when therein used, should not be held to include coal or iron.

The section of land described in the bill of complaint was included in a list of selection which embraced a large number of other sections, which list was filed in the local land office on the 19th day of August, 1905. Under the regulations of the land office, in effect in the year 1905, the railroad company, claiming grant lands, filed with local land officers its selection list, accompanied by affidavits as to the nonmineral character of the land. The local officers then transmitted the list to the General Land Office, with their report showing any conflict or protests, and the list was there noted on the books and sent to the Land Grant Division. In the latter division it was again checked and entered upon a clear list. This list was transmitted to the Mineral Division for report as to the mineral or nonmineral character of the land. In making this report the Mineral Division confined its examination to its own records, field notes of survey, and tract books for mineral claims affecting the selected lands within a radius of six miles thereof. If a mineral claim was found to exist upon the selected land, a hearing was ordered before the local officers to determine the mineral or nonmineral character of the land, and the findings of the local officers were subject to review by the Commissioner of the General Land Office. If no mining claim was found registered against the selected tract, but a claim existed or mineral indications were reported within six miles of the selected land, the railroad's list was by the local land officers published for 60 days in a newspaper and also posted on the local office bulletin board. The published notice invited persons to protest or contest the selection made by the railroad company.

At the end of the publication period, no protests being made, proof was made by affidavit that the local land officers had fully performed the requirement as to posting and publication, and the list, together with this proof, was returned to the General Land Office, and, if found regular, was entered as clear for railroad patent. The course of procedure as outlined was followed respecting the list of selected lands which contained the section 13 involved in this action. There were no protests made and no notice of any contest as against the selection of the railroad company. Patent issued in due course to the railroad company on November 20, 1905. This action was commenced on August 3, 1918. almost 13 years after patent.

The Act of Congress of March 3, 1891 (26 Stat. 1099 [Comp. St. § 5114]), provides that "suits by the United States to vacate and annul any patent heretofore issued shall only be brought within five years from the passage of this act, and suits to vacate and annul patents hereafter issued shall only be brought within six years after the date of the issuance of such patents." At the threshold of the inquiry in this case, the government is met with the objection, pleaded and urged at the trial on the part of the defendants, that the action is barred by the terms of the statute. The ground of the cause of action alleged, being affirmative fraud of the defendant Southern Pacific Railroad Company, furnishes a basis for the government's reply to this defense, which is that its action was in fact brought within 6 years after it discovered the alleged fraud under which the patent was obtained.

[1] It is now well settled that in actions to annul patents to lands issued by the government, as to which the statute of limitations quoted applies, the equitable rule that a cause of action does not accrue until the discovery of the fraud, where there are acts of concealment, is given full force, and in such a case the limiting period will commence to run at the date of discovery rather than the date of patent. Exploration Co. et al. v. U. S., 38 S. Ct. 571, 247 U. S. 435, 62 L. Ed. 1200; U. S. v. Diamond Coal & Coke Co., 41 S. Ct. 335, 255 U. S. 323, 65 L. Ed. 660; U. S. v. Bellingham Bay Imp. Co. et al., 281 F. 522 (C. C. A. 9th). The government asserts that it had no notice of the alleged falsity of statements regarding the mineral character of the land contained in affidavits filed by the railroad company until about August 21, 1912, so that, if fraud has been established and that fraud is shown to have continued, without laches on the part of the government in discovering the same until the date last mentioned, the suit is in time. The defendants have further met the merits of the action

by evidence intended to negative the alleged fraud.

Two affidavits were filed by Charles W. Eberlein, land agent of the Southern Pacific Railroad Company, with the selection list, when application for patent was made. One of these affidavits recited that "said lands are vacant, unappropriated, and are not interdicted mineral or reserved lands, and are of the character contemplated by the grant." The other of the affidavits declared that the affiant "has caused the lands selected in said company's list No. 134 to be carefully examined by the agents and employees of said company as to their mineral or agricultural character, and that to the best of his knowledge and belief none of the lands returned in said list are mineral lands." The chief mineral claimed to exist is limestone; that was the only mineral asserted by the complaint, as originally filed, to be contained in the land; but on the day of the trial, which occurred several years after the commencement of the action, government's counsel asked and obtained leave to include allegations in his complaint stating the presence also of fluorspar.

Limestone in some quality of purity and refinement has various uses, such as in the fluxing of ore, to remove impurities from the metal, the manufacture of glass, and in the processing of sugar to refine it. It also enters into the composition of cement. Fluorspar finds its principal use in the treatment of ores. The Land Department has classified limestone as mineral, unless it be of so low a grade as to be but slightly removed from the character of clay. It seems, also, that where the stone is suitable only for use in cement manufacture the lands are not subject to mineral location.

The government relied upon the affidavits as prima facie stating the facts regarding the character of the land, and at that time had no practice, and apparently its officers had no authority, to explore the ground for the purpose of verifying the statements made by the selecting railroad. It did check its records, both local and in the General Land Office and Mining Department, and did invite protests to be made against the nonmineral claim of the railroad, before allowing the patent to issue; but by so doing it did not, by any act of its officers or in any way, attempt to conduct any independent investigation as to the physical conditions on the ground. The presence of limestone in section 13 was called to the attention of the Attorney General in a letter written by D. F. Baxter under date of August 21, 1912.

[2] It must be said, I think, that, until such notice was received by the government, it relied, and had the right to rely, upon the statements made in the affidavits furnished it by the railroad company. Those affidavits in their nature, if accepted in good faith, as they undoubtedly were, without suspicion of misrepresentation contained therein, would suggest no need that the government should on its own behalf ascertain the presence or nonpresence of interdicted minerals. As was said by Circuit Judge Hunt, in U. S. v. Bellingham Bay Imp. Co. et al., 6 F.(2d) 102: "Where the party injured by the fraud remains in ignorance of it, without any fault or want of diligence or care on his part, the bar of the statute of limitations does not begin to run until the fraud is discovered, and this, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party."

[3] After Baxter wrote his first letter to the Attorney General, there was an exchange of communications between the Attorney General's office and the office of the Department of the Interior, and as at that time the 6-year period of limitation had run, both departments were doubtful of the right of the government to sue, and action in that direction was delayed accordingly. The record of the correspondence shows that the Attorney General latterly withheld suit for the principal reason that actions were pending before the Supreme Court wherein was involved a like question, and decision in which would settle the right of the government to have adjudicated the question of alleged fraud in procurement of the patent. Within the holding of the decided cases I am satisfied that the plea of limitation and laches must be overruled.

The section of land involved in this action lies in a region which is of unmistakable desert character, both as to the absence of productive soil therein and the absence of sufficient rainfall to make possible the growing of surface crops or fruit. There is nothing in the facts just stated alone which shows that the land was not of a kind permitted to be selected by the railroad company, because the act of grant did not limit such selection to agricultural lands, but expressly allowed iron and coal lands to be included, no doubt for the purpose of aiding the railroad company in its construction work by allowing it to mine coal and iron. The facts adverted to are important only as one of the circumstances present which would give notice to the selecting agents of the railroad company that

other character of minerals might likely be found in the land which would make it not subject to selection. That the presence of limestone was known to the selecting company at the time the lands were listed is admitted.

Counsel for the Southern Pacific Railroad Company in his brief states: "It is not denied, however, that Southern Pacific Railroad Company knew prior to patent that these limestone deposits existed, so that the lack of written report made at the time, or independent recollection of witnesses who may have examined the land, is perhaps of little consequence." While this admission is plainly made, the defendants have urged that the affidavits stated matters clearly within the facts because, as is contended, the limestone, and the indications thereof present on the land at the time of the selection, did not meet the established criterion that such evidences were "plainly such as to engender the belief that the land contained mineral deposits of such quality and in such quantity as would render their extraction profitable and justify expenditures to that end"—citing Diamond Coal & Coke Co. v. U. S., 34 S. Ct. 507, 233 U. S. 236, 58 L. Ed. 936. There seems to be no difference between counsel for the government and the defendants as to the propriety of applying this criterion. The same rule is elaborated in Chrisman v. Miller, 25 S. Ct. 468, 197 U. S. 313, 49 L. Ed. 770, where the rule adopted by the Land Department in classifying mineral lands is stated. There is no question here of requiring a comparison of the availability of the lands for the extraction of minerals as against a more important use, as for agriculture, because, as we have seen, the land has no availability for any purpose other than those uses to which land of distinctly desert character may be put.

Passing, then, to the real merits of the case, these questions are involved: Was the land at the time of its selection of such mineral character as excluded it from the terms of the granting act, and were the facts regarding its character, displayed to the observation of a person inspecting the same, so as to reasonably suggest to a man of ordinary prudence and reason, and one who has informed himself of all pertinent conditions, that, by the expenditure of time and money, the minerals could be extracted from the ground and marketed with reasonable profit? If the evidence justifies an answer in the affirmative to this question, then it must be held that the affidavits of Eberlein either stated the important matters contrary to the facts as he knew them, or that he recklessly made the statements without any sufficient information upon which to base them. Counsel has admitted that the railroad company knew the true conditions on the ground at the time its selections of land were listed. We must look to those conditions to ascertain whether a fraud was perpetrated.

The section largely consists of a broad, level wash, which extends generally from east to west, with a border of hilly elevations reaching into the northerly part of the northwest quarter, and like elevations extending completely across the southern side of the section; the latter extending scarcely at all beyond the line forming the northerly boundary of the most southerly section quarters. Roughly calculated, then, the entire section is practically a level wash of sand and boulders, with the exception of less than five-eighths thereof, which is hilly. There is no claim that the low-lying and level portions of the section show any indication of mineral of the reserved kind; it appearing by the testimony that geologists estimate the underlying strata as composed of slates, quartzite, and other sorts of commonly occurring rock not related to the mineral class.

In the northwest quarter of the section the principal deposit of limestone manifested its presence plainly and unmistakably in the outcroppings of the large hill at the time the selection was made. Anderson, a geologist in the employ of the railroad company, had, in the year prior to that in which the patent was issued, made a trip over the land, and observed and took note of the limestone deposit in the northwest quarter of the section. He testified at the trial, and in effect said that it was then, and ever since has been, his opinion that the limestone was not of such a character as to make the mining or quarrying of it at any time a venture that would yield a profit. He did admit that he had, at the time he examined the deposit, believed that it might have some value as a flux with iron ore. As he described it, and as the fact is as shown by all of the evidence, the deposit contained a great deal of igneous or volcanic rock, and some other impurities, which, to a considerable extent, affected its quality and increased largely the cost of mining the same; the latter condition resulting because the worthless admixture must be separated from the limerock by hand.

It was intimated on behalf of the government that, as the railroad company possessed iron-bearing land in the vicinity of section 13, a purpose was indicated, which would heighten the implication of fraud, to gain

ownership of the limestone in order to use it in the fluxing of its iron ore. As already appears, the geologist of the railroad company had thought that the stone might be used as an iron flux. The circumstance adverted to, however, does not seem to be of much significance, when it is considered that the railroad company never made any such use of the limerock, but in fact, instead of preserving it for its own use, leased the right to quarry the same, on June 5, 1914, to the defendant Sugar Lime Rock Company. A good quality of limerock is admittedly required in the process of sugar refining, and this lime was made to serve that purpose. To be sure, the Sugar Lime Rock Company had difficulty in separating the intrusive or contaminating rock from the product of the quarry, and eventually abandoned the use of that limestone, when it found other rock in a neighboring state better suited to the requirements of sugar manufacture and easier of handling. The test to which the limerock was subjected by the Sugar Lime Rock Company demonstrated that it had some commercial value, and could be mined or quarried with some profit. It is quite clear that the presence of much intrusive rock increased the cost of securing the limerock to such an extent as to greatly reduce the value of the deposit.

In the presence of all of the conditions mentioned, however, it must be concluded that the limerock indications, at the time of the selection of the land, in that portion of the northwest quarter of the section where such deposits appeared, were so plainly displayed as to compel the notice of the ordinary observer, and to suggest a mineral quality of commercial value which would not justify the railroad company in declaring the land to be nonmineral, notwithstanding its agent might have so believed. But upon the northwest quarter section, and the north half thereof only, can it be said that the mineral indications, either then apparent or afterwards demonstrated, were or are sufficient to place the land in the interdicted mineral class. There is some limestone in the dark brown rock which composes the hilly portions of the two southern quarter sections of the southeast quarter of the land. The intermixture of worthless rock in the latter deposit renders it of a quality unavailable for any present known commercial purpose, considering the great cost that would be entailed in the separation of lime from the other forms of rock.

That fluorspar was found in such form, quality, or quantity in the southern portion of the section as would satisfy the mining rule, I think the evidence does not establish. Mineral claims had been filed on ground in this portion of the section by one Garrity prior to the allotment of the land under the selection made by the railroad company, and money was later shown to have been spent in an attempt to develop a fluorspar mine. It is in evidence that later a dispute arose between the railroad company and the claimant as to the right of the latter to be on the ground, and that the railroad company in 1917 offered to sell the ground covered by the three claims for $750. Nothing came of the matter further than that, because of the objection of the patentee, work was abandoned. One of the witnesses who was interested in the claim testified that he had mined some fluorspar in a nearby locality, and had shipped a carload to San Francisco, and that it had netted him less than it had cost him to produce it. There was no water available in the locality of the claims, the use of which was admitted to be essential in the work of mining the fluorspar.

[4] This case, in my opinion, must be classed as being close to the border line, both as to the fraud charged and the mineral character of the land. Carefully considering the whole of the evidence, I cannot conclude that the government established such a case as to justify the conclusion that, except for the limestone deposit existing in the north half of the northwest quarter of the section, this land was, either at the time of selection or at the time of the issuance of the patent (or that, even by subsequent exploration, has been shown to be), of mineral character. To annul the patent to the entire section, in view of the small portion only which is mineralized, would not be justifiable. It is proper, I think, to restore to the government the entire northwest quarter of the section, in order that the limestone quarry land may be made accessible from the railroad line which crosses from east to west the extreme southern portion of the quarter section.

Counsel for the government has suggested in his brief that, as in the allotment of lands the section is the unit, any annulment made must necessarily include the whole of the section, even though but a small part be mineralized. If such is the requirement, then as a fair equivalent it ought to be that, where a small portion of the section only is mineral, the character of a mineral section is not imparted, and the patent should not be annulled under the logic of the de minimis rule.

[5] The Sugar Lime Rock Company entered the land more than eight years after the pat-

ent was issued to the railroad company. The argument of counsel for the government, that the Lime Rock Company was charged with notice of facts which would render the patent invalid at that late time, seems to me to be untenable. This company had the right to rely upon the presumption that the patent had been regularly issued, and had the right to consider the fact that the full period of limitation had run, which limitation, prima facie, would be a defense against any action to set it aside. The case is not the same as though the patent, when issued, was so affected by the infirmities put upon it by the methods under which it was secured as to be absolutely void, for it was in any case voidable only, and at the option of the government. Considering the mineral conditions of this section, it would be a fair assumption to be allowed, in favor of an otherwise innocent interest holder, that the government had determined to adopt and affirm its contract as conferring a valid right. And so I think that the Sugar Lime Rock Company has here properly insisted that it has incurred no liability, but that the liability, if such exists, must be cast wholly upon the patentee and the successor to the title.

[6] Upon the question of damages, my judgment and that of the Assistant Attorney General who prosecuted this case is at variance. That the railroad company should pay for the damage, by compensating the government for the rock removed from the ground, there is no question. The amounts expressed by certain of the witnesses must be viewed as arbitrary, when the experience of the Lime Rock Company, which quarried the rock under its lease agreement, is considered. That was the only market which seemed to offer any demand for the rock, and by the testimony it was shown that poor quality and great expense made the venture of quarrying the limerock one of small profit. There was testimony given at the trial that many tons of the rock were thrown aside unused, at the quarry and at sugar factories. The royalties and rental received by the railroad company or its subsidiary may reasonably be taken as representing the fair value of the rock in place. It is not shown that the patent holder did not secure the best return, considering the demands of the market for the kind of rock offered, that was reasonably obtainable.

The money judgment, except as to costs, which should be added, will be as just indicated. Included also in the judgment should be the amount of money received by the railroad company or its subsidiary from the San

Pedro, Los Angeles & Salt Lake Railroad Company on account of the sale made of the land within the northwest quarter section, which was acquired by the said San Pedro, Los Angeles & Salt Lake Railroad Company for railroad purposes.

Decree will be prepared accordingly.