SOUTHERN PAC. CO. et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. May 6, 1918.)

No. 2958.

1. PUBLIC LANDS �köö120—PATENTS—AFFIDAVIT.
    Where a railroad company, which selected lands under its grant of certain alternate sections of public land not mineral in character, was required to attach to its selection list an affidavit of its land agent setting forth that the lands had been examined and to the best of his knowledge were not of mineral character, the agent, in a suit to set aside the patent on the ground that the lands were valuable for minerals, must be charged with knowledge of facts which an examination would have disclosed, as well as all facts known to the railroad company's geologists and employés.
2. MINES AND MINERALS �köö17(1)—MINERAL LANDS—DISCOVERY.
    Public lands are not locatable or enterable as mineral lands until discovery, and mere information that they may be valuable for oil purposes is not a discovery.
3. PUBLIC LANDS �köö120—ENTRY—EVIDENCE.
    In a suit to cancel a patent to public lands issued to a railroad company on an affidavit of its land agent that the lands were not of mineral character, evidence *held* insufficient to show that at the time the selection list and affidavit were prepared the conditions were such as to engender a belief that the lands were valuable on account of the oil deposits, and hence a patent thereto cannot subsequently be set aside because the lands were afterwards discovered to be in an oil belt.

    Gilbert, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of the Northern Division of California; Robert S. Bean, Judge.

Bill by the United States of America against the Southern Pacific Company, a corporation, and others. From a decree for complainant, defendants appeal. Reversed, with directions to dismiss bill.

Guy V. Shoup and Charles R. Lewers, both of San Francisco, Cal., and Joseph H. Call and James W. McKinley, both of Los Angeles, Cal. (Wm. F. Herrin, of San Francisco, Cal., of counsel), for appellants.

F. P. Hobgood, Jr., Sp. Asst. Atty. Gen., for the United States.

Before GILBERT and HUNT, Circuit Judges, and DIETRICH, District Judge.

DIETRICH, District Judge. This is an appeal by the Southern Pacific Railroad Company and other defendants from a final decree entered August 9, 1915, in the District Court of the Southern District of California, canceling a patent issued to the railroad company on December 12, 1914, for 6,109.17 acres of land. The patent was procured, so the bill charges, through the fraud of the railroad company, in that it falsely represented to the Land Department that the lands were nonmineral and were of the character contemplated by the grant of July 27, 1866 (14 Stat. 292, c. 278), and the joint resolution of

June 28, 1870 (16 Stat. 382, No. 87). This grant was to the Southern Pacific Railroad, the predecessor in interest of appellant, of every alternate section of public land, not mineral, designated by odd numbers, to the amount of ten alternate sections per mile on each side of the grantee's line of road. Suitable provision is made in the act for the lieu selection of unoccupied agricultural lands in odd-numbered sections, within 20 miles of the line of road, to make good such losses as might be sustained from the primary grant because of the mineral character of lands embraced within the limits thereof. The lands in suit were selected as lieu lands under this provision, and embrace parts of sections 17 and 19, and all of sections 15, 21, 23, 25, 27, 29, 33, and 35, in township 30 south, range 23 east, Mt. Diablo Base and Meridian, which township and range will, for convenience, be referred to as 30—23.

[1] By regulation existing at the time the selection was made, the railroad company was required to attach to its selection list, and to file with the local land officers, an affidavit by its land agent, "setting forth in substance that he has caused the lands mentioned to be carefully examined by the agents and employés of the company as to their mineral or agricultural character, and that to the best of his knowledge and belief, none of the lands returned in said list are mineral lands." 19 Land Dec. 21. Such an affidavit, executed by Charles W. Eberlein, acting land agent of the company, was attached to the selection list in question, as was also another affidavit, in which he stated that the lands were "not interdicted mineral or reserved lands," but were "of the character contemplated by the grant, being within the 'limits of the exterior ten (10) miles indemnity belt," etc. While couched in technical language, the full scope of the charge as set forth in the bill is that, whereas the lands were known to be valuable for their mineral oil, Eberlein falsely represented to the Land Department that they were nonmineral, and thus induced the department to issue the patent. There is some comment in the government's brief upon the statement in the affidavit that affiant had caused the lands to be carefully examined by the agents and employés of the company, and the correctness thereof is no doubt open to question; but there is no averment in the bill of its falsity, nor is any relief claimed by reason thereof. And, besides, it is not thought that such a statement, even if untrue, is actionable in itself. It is significant here only by reason of its association with the accompanying statement that the listed lands were nonmineral in character; in that connection it may serve to fortify the view that, in making the substantive representations as to the character of the land, Eberlein is to be held chargeable with knowledge of all the conditions which such careful examination, if made, would have disclosed. Accordingly, in determining the quality and legal effect of his representation that to the best of his knowledge and belief none of the lands were mineral in character, we shall assume that he had all such available information, including of course everything that was known to the company's geologists and other agents or employés; and, indeed, as a matter of fact, we find that, through its several agencies, the company had such information as a

fairly careful surface exploration of the territory by the prospector and geologist would afford, and, for present purposes, this knowledge must be imputed to Eberlein, its responsible agent and representative. With such information, could he truthfully and in good faith represent to the Land Department that to the best of his knowledge and belief the lands were nonmineral?

[2, 3] When we come to analyze the record, we find that as to the physical conditions there is little conflict in the evidence, and that, aside from the "expert" testimony, the greater part of it relates to the geological significance which people variously qualified or unqualified were, during the general period in which the lists were filed, inclined to attach to such conditions. The original list was offered for filing November 14, 1903, but to correct certain errors a new or amended list was filed on September 6, 1904. We therefore inquire: What were the observable geological and other physical conditions during that period?

The lands are situated in what are locally known as the Elk Hills, the range of which is approximately 15 miles long and 6 or 7 miles wide at the widest point, with a northwesterly and southeasterly trend. Toward the east they fall quite abruptly for 1,000 or 1,200 feet to the broad San Joaquin Valley. From 5 to 10 miles westerly, with a similar trend, is the main uplift of the region called the Temblor Range, between which and the Elk Hills are the McKittrick Hills to the north, and the Buena Vista Hills to the south; the several uplifts being separated and defined by narrow intervening valleys. To the prospector for oil doubtless the most conspicuous feature of the territory in 1903 and 1904 was the actual development, more particularly in the McKittrick Hills, but also at Sunset, 25 or 30 miles to the southeast, and at Midway, halfway between, the latter fields both being upon the easterly flank of the Temblor Range. In the aggregate there were in these three fields in 1904 between 200 and 300 wells (part of them producing), and particularly in the McKittrick field the presence of oil in large volume reasonably near the surface and economically susceptible to extraction was abundantly shown. Perhaps 20 per cent. of these wells were in the Midway field, and the others were about equally divided between McKittrick and Sunset. If a line had been drawn from McKittrick to Sunset, through Midway, it would have been observed that all of the development was within a zone not to exceed a maximum width of 3 miles, and for most of the distance less than 2 miles. The railroad company's geologists, who were in the territory at various times during this period, doubtless noted oil seepages and oil sand outcrops for many miles along the line of the McKittrick development, and in several places along a line or zone westerly from the Midway field. From observations readily made they must have concluded that underlying this zone there were shales in which it is supposed the oil originates, and beds of sand into which it migrates. They must have further concluded that the several uplifts are structural, that is, they are the results of a folding or of foldings of the earth's crust, and they would have known that such a fold or anticline is a favorable formation for the accumu-

lation and retention of oil. They would have determined that the principal dip of the country is northeasterly, and the general trend of the fold axes is northwesterly and southeasterly.

With these known conditions, and with such additional surface occurrences as might have been observed in the Elk Hills themselves (admitted by all to be of minor significance), should they, by a process of geological correlation, have reasonably concluded that the lands in question were mineral lands, in the sense in which the phrase is judically used? They would have noted that from this zone of development it was a distance of between 3 and 4 miles to the nearest, and approximately 9 miles to the most distant, of the lands in question, with a valley intervening. The only development, if such it may be called, upon the township in which the lands are embraced, or to the north, or to the east thereof, or to the south (aside from the Midway and Sunset fields, several miles away), was an abandoned prospect hole in section 8, 30—23, sunk to a depth of about 900 feet, in 1901, without encountering oil; and another abandoned hole on section 2, 31—24, sunk about 600 feet, in 1901, striking small amounts of oil. As to surface indications, such as gas blow-outs, brea, and oil sands, which seem to be of about the same significance to the oil prospector that float and stain are to the lode prospector, the evidence is not highly satisfactory, and, when limited to the lands in question, or, indeed, to the entire township in which they are embraced, very meager. In a few places to the north and east, witnesses who testified doubtless believed that they found traces of oil that has vanished; but whether any importance at all can be attached to these occurrences is left in much uncertainty because of the doubtful character of the most conspicuous one, and the only one the existence of which was more or less generally known, namely, a so-called oil seepage in section 32, 30—24—a little more than a mile easterly from the east boundary of township 23. To say nothing of the view of the defendant's experts that there was no oil here, or anything to indicate the presence of oil, one of the chief experts for the government testified that he had made two examinations of the sands (which, it is to be noted, were dry), and upon a choroform test they gave no oil. He found some particles of carbon, and by a course of reasoning reached the conclusion that at some time in the past escaping gas carried oil, which had either been burned or had evaporated. But manifestly, if necessary to resort to such possible reasoning, it can scarcely be held that an occurrence of so doubtful a nature and significance must have been regarded by the defendant's geologists in 1903 and 1904 as having an important bearing upon the question of the mineral character of the selected lands.

Resorting to the history of the region, the railroad company's geologists would have learned that until oil was discovered in the Kern river field near Bakersfield in the spring of 1899, 30 miles to the east, the land in suit, as well as the surrounding territory, had been used for grazing purposes only, and had not attracted serious attention for its mineral possibilities; that following the Kern river discovery there was widespread excitement, and the whole countryside

was plastered with "locations" and "relocations." People from all walks of life were drawn into the race for claims. No one pretended to make an actual discovery, and one group of speculators, employing 25 or 30 locators, located approximately 50 square miles. Everything unpatented was taken in. The claims, of course, were speculative, and in the Elk Hills no actual discovery was made, and, with the two exceptions heretofore noted, there was no attempt at discovery or development. Claims were held, not by working them, but by the cheaper method of relocation, so that in 1903 locations were sometimes piled upon each other three or four deep. As a result, doubtless, of the discoveries in the Kern river field and the later ones at McKittrick and Sunset, as well as of the current excitement, the Commissioner of the General Land Office, on February 28, 1900, directed the local land officers to "suspend from disposition until further orders" a large body of lands, including the entire township in which the lands in suit are situate, and of this withdrawal the railroad company and its agents of course had knowledge. While the question is perhaps of but slight importance, it may be said in this connection that in our view this order was intended to withdraw lands from agricultural entry only, and it was so generally understood. The interests of the government were not imperiled by the possible mineral entry of comparatively worthless grazing lands, and therefore no reason existed for suspending that form of entry. And that the order was intended to be so understood is made clear by the contemporary construction of the department from which it issued. In response to a request of the railroad company that an investigation be made by the land office, with a view to lifting the suspension, so that the lands could be selected under its grant, certain correspondence passed, in all of which it is assumed that the suspension extended only to agricultural entries. For example, in the letter of December 10, 1903, from Acting Commissioner Fimple to Special Agent Ryan, there is found this sentence:

"It is stated that nearly four years have elapsed since the order of suspension and no mineral entries have been made for any of said lands."

And in the letter of February 11, 1904, from the same office to the register and receiver of the local land office, advising them of the restoration of the lands to entry, the original order is referred to as having "suspended (the land) from disposition under the agricultural land laws upon allegations that the same contain deposits of mineral (oil)." Although as thus appears the lands were open to mineral entry during three years or more after the excitement of 1899 and 1900, leading to the speculative location of all the public lands in the region, there was no effort to develop any of the lands in suit, nor, with the exception of the two ineffectual attempts already noted, was there any development anywhere in the Elk Hills, or any entry of any lands therein for patent. To state the case fully, it should be added that during this period the price of oil was comparatively low, and transportation facilities were poor.

Of all of these conditions—the "oil land boom," the following inactivity and depression, the rapid development in the narrow McKittrick-Midway-Sunset zone, the two abortive attempts at development

in the Elk Hills, the total want of oil land entries, notwithstanding suspension from agricultural entries, the general abandonment of locations—the railroad company's agents must have known, and must have considered as having more or less weight.

Such in outline are the material features of the geology of the region and of its development as an oil field. The geologic facts are interpreted by oil prospectors and operators, and by geological experts; and to this class of testimony we now direct attention. It is too voluminous to review in detail, and the most general analysis must suffice. As to certain geological features of the region there is practical harmony of view. It is virtually conceded by the experts for the railroad company that in the McKittrick-Midway-Sunset zone it was known that there was oil in considerable quantities, susceptible to profitable extraction, and that an anticline such as is found in the Elk Hills is an occurrence favorable to the accumulation and retention of oil, to which prospectors would hopefully look upon discovering the presence of oil in adjacent territory. They also concede that it then appeared probable that some oil would be found, but not in sufficient quantities or near enough the surface to warrant extraction and marketing. Upon the other hand, while confident that oil is to be found in the lands in suit, the government experts virtually concede that in the most favorable view its depth is great—so great in fact that under the conditions existing in 1903 and 1904, and, indeed, at the time the testimony was taken, extraction was economically impracticable. When it is borne in mind that a deep well costs at the rate of approximately $15 per foot, a large flow of oil, with fair prices, must be assured to justify the sinking of a well 4,000 or 5,000 feet deep. While some estimates of the probable depth were ventured, they were made reluctantly, and were apparently based upon data insufficient to give them the weight of reasonably satisfactory scientific deductions. Nor could any intelligent estimate be made of the quantity or quality of the oil. But while in still other respects the geologists are in substantial agreement, when it comes to a statement of general conclusions upon the ultimate question of the character of the lands, there is seemingly great diversity of opinion. To a certain degree, it is true, this variance is, upon analysis, found to be more apparent than real. For one witness to affirm and another to deny that the Elk Hills uplift is "oil territory" does not necessarily imply a real issue of fact, for the phrase "oil territory" has no fixed or well-recognized meaning, and may very well be used in one sense and understood in another. When therefore we look beneath the mere form of expression, we are not surprised to find that in a measure the seeming diversity disappears.

We can illustrate the point and at the same time convey some idea of the scope and substance of the expert testimony as a whole better by quoting at considerable length from a single witness than by assembling fragmentary and conflicting statements from many. Naturally, no expert witness for the one party will be wholly satisfactory to the other; but suppose that for our purpose we take the testimony of a witness called by the government, Prof. John Caspar Branner, of Stanford University, whose general competency and familiarity with

the geology of the California oil fields are conceded. Dr. Branner visited the McKittrick field in 1900, but did not go into the Elk Hills. This latter territory he inspected for the first time about 1910, and again in 1912. The testimony given by him upon direct examination, upon which the government most relies, is found in the following paragraph:

"I should say that if any competent geologist, observing the natural waste of oil about McKittrick and the state of development in 1900 or a year or two subsequent, and visiting the Elk Hills and making some examination of the structural formation, failed to form an opinion that the Elk Hills were oil in character and that there was an oil-bearing zone underneath those hills, he did not understand his business."

## Upon cross-examination he testified:

"In passing upon the character of the Elk Hills, I did not determine in any way the quantity of oil and made no attempt to do so. I could not have done so from the examination I made. That could only be determined by putting down wells. One well might determine the matter and it might not. Development is required to determine whether or not that is a valuable oil deposit.

"A geologist does not determine the economic value of the land for oil. All he undertakes to do is to say whether or not the land has prospective value. I mean by prospective value, that the company proposing to develop that region should take it up—buy it, if necessary—and put down a well on it, should prospect it. I can best illustrate my idea of it by saying that I have considered it a reasonable investment, or, if you please to call it so, venture. I should have advised anybody who might have employed me to report on those propositions, to buy the lands with a view to developing them as petroleum lands, from the surface indications and my knowledge of the surrounding conditions and of the oil formations in general. I could not, when I first examined the land, have given an assurance that oil in valuable quantities could have been found. I could do so now on the basis of wells that have been put down there and have found oil. On the basis that in only two cases out of twenty-eight wells, some of them 4,000 feet deep, indications of oil had been found, and in those two cases oil had been found in quantities not sufficient to make these particular wells profitable, I would not hesitate to advise operators to go ahead with prospecting. In the first place, it depends on how those wells were located. If the wells were put down without reference to the geologic structure, they might go to an enormous depth without getting oil, and yet they may move off to one side and put down a well, within 1,000 or 2,000 feet, and get entirely different results. And still, I may add, the general structure of the Elk Hills is so favorable to the accumulation of oil in that region that, if they had gone to 5,000 feet and not found the oil, I should still advise a company to not give up hope of finding it. * * *

"As to whether all the portions of a bed of Monterey shale would be equally producing, I will say that these diatomaceous shales, being the source of oil, the oil does not as a rule stay in those beds. It passes out into an absorbing bed—a porous bed—where the oils accumulate. Now, the accumulation, therefore, depends on the presence of diatom beds to furnish the source, but the accumulations themselves, as you see, depend on the nature of the beds into which those oils pass; and you may have no beds there to receive that oil. The conditions may be unfavorable and the beds overlying them into which that oil can be expected to pass may vary in texture so that the oil accumulates more in one place than in another, so that the oil beds may be pockety even under conditions where you have diatomaceous beds of great thickness and evenness. * * *

"When I first went into the McKittrick district in 1900, I visited the Temblor Range. I had two assistants working with me to do topographical work, and we were mapping an area of several square miles, in detail, and my in-

pression is I must have been there something like ten days or two weeks working on that geology.

"I made quite a careful examination during that period for the purpose of reporting on oil possibilities and reached the conclusion that there was oil, probably in paying quantities, on the property, if the wells were put down at certain points; and I located the wells and they found the oil, but I cannot say whether in paying quantities or not. From my surface examinations I could not determine with any degree of exactness whether there was oil there in paying quantities. That had to wait the test of the drill. * * *

"Even if I had not seen that seepage, my opinion would have been, owing to the formation of the Elk Hills, that they were suitable for the accumulation of oil; but that would not necessarily mean that they had accumulated oil. That could be determined only by exploration. I suppose there are promising formations giving indications of adequate reservoir space for the accumulation of oil, that do not produce oil in paying quantities. I should say such things do occur. * * *

"Suppose you had an oil company and the geologist looked at that whole anticline. The geologist would naturally say, 'Look for your petroleum along where these domes are.' But, at the same time, that whole arch there is practically an inverted arch or trough under which the petroleum accumulates. Now, there is an end to the petroleum somewhere. It is not going to accumulate everywhere in that entire arch. So, you can bore holes right along the crest of the anticline and in some places get great quantities of petroleum and in other places you won't get any at all, because the water crowds the petroleum up underneath there.

"There might have been an anticline broken across and so dislocated that the petroleum might have floated right out, and it might have come out to the surface, especially on the side that is uplifted, so that it would be floated out to the surface and lost. There are sometimes processes going on in the oil beds where the oil is deposited which would make it unprofitable to get out the oil. * * *

"I do not think there is any way to determine from an examination of the surface how large an area yields oil at any particular point. It sometimes happens that the sand beds become hardened so that they cease to be media through which oil can pass, and it occasionally or even frequently happens that the sand beds pinch out between hard layers of strata. That is one of the reasons that one well is not a complete test of the character of any given territory; and, as to other reasons therefor, I will say it depends on the localization of the oil. * * *

"I do not think that the presence or absence of water in the strata carrying oil could be regarded as decisively having a bearing upon where you would find the oil; certainly not in the light of what I understand to be the well-known fact in regard to the occurrence of petroleum in the San Joaquin Valley to-day. It used to be considered that if a well were put down and struck water there was no use looking for petroleum there; but I understand that the water has been shut out, in a number of instances, and the well has gone on deeper and found the petroleum below the water horizon.

"It is my general impression that the view I have first mentioned generally prevailed in the California oil fields until a few years ago.

"Other things permitting, water would force the oil into the anticline to where there is a large accumulation of gas developed at the crest of the anticline. The oil would stay on top of the water, and the presence of water would have considerable bearing upon whether you would find oil in the anticline or not. These conditions cannot be determined from a surface examination.

"It is not possible from a surface examination such as I made of the Elk Hills to determine the depth of the oil sands. There are only two ways in which that can be determined. One would be to work out the geology with great care and detail over the region—not only in the Elk Hills themselves, but in the surrounding country—to find in what horizon the oil accumulates, and then by fitting one's evidence together and studying it one might come to

the conclusion in regard to the depth at which the well would reach the oil-bearing bed. The only other way would simply be to put a well down and test it.

"I have not made sufficient examination with that question in mind, to be able to tell whether you could ascertain the depth without a well, in the Elk Hills. I made no attempt to do so. The purpose of my examination was to ascertain, generally, whether that could be considered as possible oil territory, and I made no attempt to determine whether it was paying oil territory. ✻ ✻ ✻

"It is not ordinarily possible for a geologist, or practical oil man, to determine from the existence of an oil bed at a particular point that the bed continues for any particular or definite distance in all directions or any direction, partly because the oil comes to an end where it rests on the water; partly because the porous beds are not infrequently more or less lenticular in form. That is, they may pinch out and come to an end of themselves in that way, by thinning down, or they may be interrupted by breaks, what we call faults or displacements of beds, so that the beds may be chopped square off."

Upon redirect examination he stated that the Monterey shales were very thick—approximately 5,000 feet in the region just west of the Elk Hills and the Buena Vista Hills—and that he would not expect them to be so faulted as to be disadvantageous to the accumulation of oil in these hills; that he had no reason to believe that the oil sands were thin or hard or pinched out; and that geologically quartz mining is less certain than petroleum, but that coal mining is most certain of all. And then he testified:

"In coal mining one can get a very close idea of the tonnage to be taken out under a given tract of land; that is, we can calculate the product. It is the rule, in fact, in the anthracite regions in Pennsylvania, that the company will have in its reports by its geologist: 'We have so many acres of land. This land yields so many tons an acre.' And they count on that just exactly as if it were money in the bank. Now, in petroleum mining, of course you can't do that exact thing; there is an element of uncertainty about it that you don't find in coal mining. ✻ ✻ ✻

"I should expect to find certain parts of the folds in Elk Hills more productive than others; but it would be a pretty nice question to say just where the petroleum is going to come to an end. I don't think anybody could tell.

"It seems to me that the best chances for oil in the whole country in that region were in the Elk Hills and the Buena Vista Hills. In forming that opinion I took into consideration the possibilities of the nonoccurrence of oil resulting from the conditions of the sand and the pinching and hardness of the stratum, and other interruptions; I think that any reasonable geologist knows that there is a certain amount of risk in any kind of petroleum mining. He counts on that.

"I should say, decidedly, that the conditions in the Elk Hills are such as to warrant the ordinarily prudent man in the investment and expenditure of money with a reasonable expectation of developing a paying oil property. But I should like to explain this, that if we went back to the conditions as they existed there before any wells were put down in either of those hills, and if I had been the consulting geologist for some company or party who anticipated putting down wells there, I should have put it to him in this way: 'In my opinion the geology, altogether, of the mountains to the west, and the floor of the valley, and everything taken together, strongly suggest that these hills are the best place in which to put down oil wells. There ought to be, so far as we can see, enormous quantities of petroleum under those two groups of hills. Now, there is nothing absolutely certain about putting down an oil well in a new region; there is a certain amount of risk about it and you can't get away from that risk.' And I should have said to those men:

'If you have got money to risk and you can afford to lose it, put it in there; if you can't afford to take any risks, you had better let somebody else do it.'

"I mean that any one who had money to risk and who might afford to lose it might get larger returns for his money than he would from an ordinary investment. Perhaps I ought to say that one of the reasons for that risk lies in the fact that there is no way, short of putting a well down there, to determine the thickness of the strata that overlie the oil-bearing bed. As every one knows, who knows anything about petroleum wells, you may have an enormous volume of petroleum so deep that you can't get it, and I should have said that may be the possibility there. Of course, the developments there have shown that the oil is there, and the question now, of course, is entirely different from what it would have been before those wells were put down.

"It is my belief that there is an enormous petroleum deposit in those hills, but I have made no attempt to work out the details as to the depth and am not prepared to state whether it would be 2,500 or 5,000 feet."

### And again, upon recross:

"I did not mean to say that I could tell whether the oil-bearing beds under the Elk Hills were folded, faulted even, or what condition they were in; that I could not determine. It might possibly be folded and overturned.

"I don't know when I first heard of the change of view in reference to water being found in oil wells; it was comparatively recent; certainly within three or four years, but I would not say exactly. Prior to that time water in a well had been regarded as an almost fatal condition."

### And still again, upon redirect:

"I should have said that I did not know whether water, under the conditions mentioned above, would be fatal or not, because my observation in regard to water led me to believe that it could be separated from oil horizons and that it was separated from them; but the well drillers all protested, so that, as far as my experience went, when they got to water they gave it up as no use."

### And finally, upon recross:

"I do not mean to be understood as saying that I actually determined that the territory did contain an immense quantity of oil. I meant to say that if I had gone over that ground in 1900 with a view to saying whether or not those were probably petroleum lands, I should have, under those circumstances, pronounced them oil lands and recommended their exploitation to any one who was able to take the risk. I realized that the risk might result in a total loss of the investment."

In considering this testimony, it should be borne in mind that nowhere in the record is there any attempt to show, nor is there any claim, that any subdivision of the lands in suit contains more oil or is more valuable for oil than any other subdivision of such lands, or, for that matter, than any other part of the entire territory embraced in the Elk Hills. So that (to make a concrete case), if we are to find that the southwest quarter of the southwest quarter of section 19, 30—23, was known oil land, we must also find that every 40 acres in a tract aggregating 40 or 50 sections is of the same character. Having in mind this aspect of the case, perhaps we should supplement the testimony of Dr. Branner with the views of "practical oil men." Frank Barrett, a witness for the government, was 67 years old, and had been in the oil business all of his life—after 1905, in California. He examined 30—23 in 1899, and "recommended the entire south half of the township as good oil-bearing territory." And yet he testified:

"I believed the country might produce oil, and I was examining it with reference to its character as an oil prospect. I knew of no discovery of oil in the township and heard of none. I could not have said, 'This is known oil territory.' I could only have said that, in my opinion, it would prove to be such. My experience extends back pretty nearly to the time the first oil well was sunk in this country. I have seen promising oil territory develop, not oil, but I have seen them throw out what was pretty near as good as oil —gas—plenty of it, that was utilized for manufacturing purposes. I have observed promising indications very frequently that didn't pan out. The oil business is a good deal like elections. I don't think the percentage of failures in the oil business is greater than 50 per cent. If it is gone into intelligently and systematically, but, still, at the same time, you can't—well, I will illustrate to you. In one section a well down 3,200 feet and no oil; the next section to it, 250 feet, and good producer. A high priced expert couldn't see a bit deeper into the ground than another. The oil doesn't always appear where they say it will. The true expert is the drill. You couldn't say that a territory is known oil ground till you put a drill in it. It is not known till it is proven."

W. E. Youle, an operator of long experience, also produced as a witness by the government, having first stated that he regarded the Elk Hills as oil territory, testified:

"I didn't at that time come to the conclusion as to the depth we would have to sink. That would be out of the question. I never heard such a question asked before. It would be far from an experienced man's ideas to think of such a thing. There is a gamble in the oil business, and we are willing to go just as long as the string will let us or the money will let us, and often go very deep; and I do not believe that I ever heard an expert oil man or a geologist ask the question before what he thought of depth, because it is so utterly foolish to think that a man could tell anything at all about the depth."

And again:

"I know a man that had 16 dry holes and made a million dollars after that. He got oil in the same country. He crept out and got it.

"The fact that oil is found on one section is not evidence that it may be found in every section in the township; there may be kidneys. Oil is not contained like a river under ground, but in kidneys. While you are in the oil sand all the time, we know by experience that there are dry holes drilled in oil sand. Had those been drilled, the first one, two, or three, you might condemn the territory and throw it out, the same as the Associated did. It might have been possible to make a well for the purpose of getting the land cheap. I have had fellows do it on me, who owned the ground, and get the sand and wouldn't tell about it and you had a dry hole.

"The discovery of oil in one section or quarter section does not indicate to a practical oil man that oil will be discovered in every section in that township. It implies this: If you get oil in this section, experience has taught us that oil is not just in that little space in that well, but that it has a direction somewhere. And immediately you will find oil men locating and acquiring lands quite a distance from that well. You find that among oil men because experience has taught that there is a direction to that oil vein."

By "oil territory," it would seem to be clear, these and other government witnesses mean territory where the observable geological conditions are such as to justify expenditures in prospecting, and prospecting by those who are able to take the chances. Using the language of the last-named witness:

"I had had no experience in that field to the extent of $50,000 in one hole. I could drill 3,500 or 4,000 feet for $50,000 or less.

"I did not contemplate having to go that far. The oil business is a gamble. It is not like farming. You just bet that you don't go down that deep and

that territory was good to have bet on. If you win once in four or five times, you make a lot of money. That is the reason why I would have advised people to spend $50,000 or $100,000 there. I wouldn't advise widows and orphans and dishwashers and cooks who could not risk money; but, if you wanted a chance to make a million dollars, I would pick the Elk Hills quicker than any piece of land in there, because the formation justifies what I say."

As expressing the general views of the geologists produced by the defendant we can perhaps do no better than to quote the conclusion of Frank M. Anderson, who testified at great length touching both the geology of oil and the economic factors to be considered in producing and putting it upon the market, as well as in relation to local conditions in the Elk Hills:

"My conclusion as to the likelihood of the Elk Hills being then or ever being oil territory was negative. That is to say, I did not believe that they were oil-bearing or ever would be found to be oil-bearing. At least, not in paying quantities—not commercially oil-bearing. I suppose that I did expect there might be some insignificant deposits of oil found in them, as there might be in any part of the country between Sunset and Coalinga if there was a well put down in these beds. All of them throughout their whole extent are more or less organic in character, and, if a well is put down in a strata containing these organic materials, there would be insignificant and unimportant occurrences of gas and oil found nearly anywhere, and that has been generally the case wherever wells have been drilled so far as I know. But as to these hills containing any commercial deposits of oil, I didn't believe they would, and I don't now believe they would."

It may be of some assistance to refer to the general views of two other geologists, who were not sworn, and who, so far as the record shows, were neutral touching the present controversy and the parties thereto. From certain bulletins prepared by Mr. Ralph Arnold, who, it was stated by Dr. Branner, has done "more work for the United States than any other man in connection with the oil geology in California," and "has the reputation, deservedly, of being an able geologist," the following extracts were read in evidence:

"Any one at all familiar with the conditions of occurrence of petroleum in the California fields knows that any but the most tentative predictions as to the location of the oil are extremely hazardous. The following suggestions, based on the evidence in hand, although lacking definiteness for the reasons above stated, may be of some assistance to those engaged in developing this field."

And again:

"It must be borne in mind, however, that absolute determination, by work on the surface, of the occurrence or nonoccurrence of oil in any one locality, is not possible. The best that can be done is to calculate the degree of probability on the basis of surface indications and structural conditions."

And from a bulletin issued relative to another California field by Mr. Robert Anderson, who was Mr. Arnold's assistant, and upon his resignation was put in charge of the petroleum work in California by the United States survey, the following is taken:

"For an undeveloped region such as this, in which the character of the rocks makes it not impossible for oil to be present, but which for the most part has not been subjected to experimental test by the drill and in which the local tests made have been inconclusive, it is of course impossible to

reach positive conclusions as to the occurrence of oil in commercial quantities at depths."

With the observable facts and conditions as we have sketched them, interpreted in the light of geologic science, should it be held that at the time of their selection in 1904 these lands were known to be valuable for petroleum? Upon behalf of complainant it is conceded that the available information was insufficient to constitute a "discovery," as that term is used in the mineral land laws, and that therefore the lands were not locatable or enterable as mineral lands. Butte Oil Co., 40 Land Dec. 602. But it is contended that land may be "known to be valuable" for its mineral content, and yet such knowledge be insufficient to constitute "discovery." Manifestly, from this view, if adopted, it would necessarily follow that there are bodies of unreserved public lands for the private acquisition of which Congress has made no provision. But whether "discovery," in a legal sense, necessarily implies actual exposure to the eye, is an inquiry not directly involved here, and, in view of its far-reaching importance, its definitive answer should await a suit in which it is directly put in issue. While therefore we put aside as being of doubtful relevancy the decisions which define "discovery," especially in the case of metaliferous deposits, we are inclined to regard as in point cases construing and applying section 2333 of the Revised Statutes of the United States prescribing the procedure where a lode is embraced within a placer claim. It is there provided that, "where a vein or lode * * * is known to exist within the boundaries of a placer claim," an application for patent for placer which does not include an application for the lode shall be construed as a waiver by the applicant of any claim to the lode, and the title thereto shall remain in the United States, notwithstanding the placer patent. The granting act under consideration here excludes from the grant all the lands which at the time of their selection by the grantee were known to be valuable for their minerals. The terms of exclusion in the two statutes, it will be observed, are closely analogous, if not identical, in meaning. In construing and applying section 2333, it was said, in Sullivan v. Iron-Silver Mining Co., 143 U. S. 431, 12 Sup. Ct. 555, 36 L. Ed. 214:

"Defendants offered a mass of testimony, the scope of which was similar to that condemned as insufficient in the case of Iron Silver Mining Co. v. Reynolds, supra (124 U. S. 374 [8 Sup. Ct. 598, 31 L. Ed. 466]). Its purport was that it was commonly believed that underlying all the country in that vicinity was a nearly horizontal vein or deposit, frequently called a blanket vein; and that the parties who were instrumental in securing this placer patent shared in that belief, and obtained the patent with a view to thereafter developing such underlying vein. But whatever beliefs may have been entertained generally, or by the placer patentees alone, there was up to the time the patent was obtained no knowledge in respect thereto. It was, so far as disclosed by this testimony, on the part of everybody, patentees included, merely a matter of speculation and belief, based not on any discoveries in the placer tract, or any tracings of a vein or lode adjacent thereto, but on the fact that quite a number of shafts sunk elsewhere in the district had disclosed horizontal deposits of a particular kind of ore, which it was argued might be merely parts of a single vein of continuous extension through all that territory. Such a belief is not the knowledge required by the section. In the case referred to this court said: 'There may be difficulty in determining

whether such knowledge in a given case was had, but between mere belief and knowledge there is a wide difference. The court could not make them synonymous by its charge, and thus in effect incorporate new terms into the statute.'"

See, also, Iron Silver Mining Co. v. Reynolds, 124 U. S. 377, 8 Sup. Ct. 598, 31 L. Ed. 466; United States v. Silver M. Co., 128 U. S. 673, 9 Sup. Ct. 195, 32 L. Ed. 571; Migeon v. Montana Central Ry. Co., 77 Fed. 249, 23 C. C. A. 156; Thomas v. South Butte M. Co., 211 Fed. 105, 128 C. C. A. 33; Barnard Realty Co. v. Nolan (D. C.) 215 Fed. 996.

But of more decisive importance, the government contends, is the comparatively recent case of Diamond Coal & Coke Co. v. United States, 233 U. S. 236, 34 Sup. Ct. 507, 58 L. Ed. 936. Upon it, it places its chief reliance, and throughout the trial its representatives have studiously sought to establish a state of facts upon which to predicate the claim that in their legal aspects the two cases are substantially identical. The Diamond Coal suit was brought to set aside, for fraud, homestead patents to what were alleged to be coal lands, in the state of Wyoming. The relief prayed for was granted by the Circuit Court of Appeals, and in affirming the decision the Supreme Court took occasion to restate in comprehensive form the principles under which the issues in such a suit are to be determined. After referring to the familiar doctrine that the government must bear the burden of proof, and "sustain it by that class of evidence which commands respect, and that amount of it which produces conviction," the court said:

"To justify the annulment of a * * * patent as wrongfully covering mineral land, it must appear that at the time of the proceedings which resulted in the patent the land was known to be valuable for mineral; that is to say, it must appear that the known conditions at the time * * * were plainly such as to engender the belief that the land contained mineral deposits of such quality and in such quantity as would render their extraction profitable, and justify expenditures to that end. If at that time the land was not thus known to be valuable for mineral, subsequent discoveries will not affect the patent. * * * If the proofs were not false then, they cannot be condemned, nor the good faith of the applicant impugned, by reason of any subsequent change in the conditions. We say 'land known at the time to be valuable for its minerals,' as there are vast tracts of public land in which minerals of different kinds are found, but not in such quantity as to justify expenditures in the effort to extract them. It is not to such lands that the term 'mineral' in the sense of the statute is applicable."

The novelty, if any there be, in this restatement of the rule, is to be found in the suggestion that the requirement of "knowledge" of the mineral character of the land is satisfied by knowledge of "conditions" which are "plainly such as to engender the belief" that the land is valuable for its minerals. To be mineral in fact, it is further explained, the lands must contain "mineral deposits of such quality and in such quantity as would render their extraction profitable and justify expenditures to that end." Of course, it will not be assumed that the court intended to repudiate the doctrine which it had announced in Iron Silver Mining Co. v. Reynolds, and had reaffirmed in Sullivan v. Iron Silver, etc., supra, from which we have already quoted. There is no real conflict. The distinction is to be found in the fact that

in one case the "belief" referred to was without any substantial basis, whereas in the other it was induced by deductions which the responsible, qualified, practical man would naturally make. The "belief" approved in the Coal Case is an intelligent, rational belief. It is the knowledge acquired through scientific deduction, or through reasonable inference, by persons competent, because of their learning or experience, to make such deductions or to draw such inferences. The court having there reasoned from visible to invisible conditions, it is here contended that, if the conclusion was warranted that a coal measure lay beneath the surface of the lands in suit, by parity of reasoning it should be held here that there is oil beneath the surface of these lands. Two assumptions are involved. The first is that the occurrence of petroleum in the earth is subject to the same geological laws as coal measures. But is such the fact? True, both are to be found in horizontal or stratified deposits, but the record abundantly shows that the close analogy ends there, and in the case of oil not only are there more unknown factors in correlating the known with the unknown, but there are contingencies incident to commercial exploitation to which coal is not subject. Such in terms, as we have already seen, is the testimony of Dr. Branner:

"In coal mining," he says, "one can get a very close idea of the tonnage to be taken out of a given tract of land; that is, we can calculate the product. * * * Now, in petroleum mining you cannot do that exactly; there is an element of uncertainty about it that you don't find in coal mining."

Indeed, the difference must be obvious. A coal bed is fixed and unchangeable in relation to the inclosing strata. It may be bent or broken together with the folding or crushing of the earth's crust, and its original continuity may be interrupted by faulting or erosion but its relative position remains unaltered. Not so with oil. It is mobile. It is not sought in the shales in which it originates, but in the porous sand strata into which it migrates. If it has not escaped from the sands through some break in the continuity of the inclosing strata, it may be uniformly persistent, but with no such degree of certainty as in the case of coal or phosphates. Owing to the pressure of water and gas, it may be forced to and held in "pockets," or confined to those portions of the folded sand stratum lying between certain horizontal planes or levels, above or below which zone there may be nothing but gas or water. For that reason, while the sand stratum may, like a coal bed, be continuous, and may be found at any point beneath a given area, it may turn out to be wholly barren of oil in one place, while carrying an abundant supply but a short distance away. Until recently at least, according to the testimony of Dr. Branner, to encounter water in driving a well rendered the enterprise hopeless, in the eyes of practical oil men. So too it has been more or less generally thought that oil does not abide the presence of sea water, and there is evidence to the effect that in this region sea water may be encountered from 1,200 to 1,500 feet beneath sea level.

Now as to the second assumption, that the "known conditions" are substantially the same here as they were in the coal case. In that case 34 patents had been issued to representatives of the coal company,

to 2,840 acres of land, upon what are known as soldiers' additional homestead entries. The defendant, to whom the lands were conveyed, was engaged in mining coal upon a large scale from adjacent lands, and its well-informed and experienced superintendent acted upon its behalf and as its agent in the acquisition of patents, the proceedings for which were initiated in 1899, and continued through two or three years. The court said:

"For many years the district in which the lands were situate had been known to contain coal. They were surveyed in 1874, and the surveyor reported one of the sections as coal land; the others being contiguous to lands similarly reported. This was shown in the field notes and upon the official plats. The lands were in a valley, 3 or 4 miles in width, bounded on the east and west by foothills. A thick bed of coal was disclosed in the eastern face of the western hills, but its quality was not such as to make it of commercial value. Along the western base of the eastern hills was the outcrop of another coal bed. This outcrop had been weathered down and in some places covered by the wash from above, but it could be traced upon the surface for several miles. It had been opened up at different places, and the openings disclosed a coal bed, from 6 to 14 feet in thickness, dipping to the west at an angle of from 15 to 25 degrees from the horizontal, as did the Cretaceous rocks with which it was interstratified. This coal was of superior quality and recognized commercial value, and the rocks containing it were the coal-bearing strata of that region. The lands in controversy were west of the outcrop, in the direction of the dip. Some were near the outcrop, and the east line of the farthest section was about a mile and a half away. There was nothing upon their surface showing the presence of coal beneath; nor anything indicating that the bed outcropping on the east and dipping to the west did not pass through them. Unless valuable for coal, they were not worth to exceed a dollar and a quarter an acre. They were arid sagebrush lands, about 7,000 feet above sea level, and afforded very limited pasturage. Without irrigation they were not susceptible of cultivation, and the cost of securing water for that purpose was prohibitive.

"Attracted by this outcrop, the coal company opened a mine thereon, in the vicinity of these lands, in 1894. In the beginning the output of the mine was small, but it reached 183,750 tons for 1897, 259,608 tons for 1898, and 441,277 tons for 1899."

It was further shown that this superintendent, who had knowledge of all the conditions, had in 1898 engineered a project for procuring the lands (which he deemed to be valuable for coal) through the medium of "dummy" homesteaders. These dummies, having been paid $500 each by the company, later relinquished upon its request, so that its superintendent and another of its representatives might make the soldiers additional entries. In 1898 this same superintendent had filed in the land office a sworn declaration attending his application to purchase one of the tracts in controversy, in which he stated that it contained a valuable vein of coal. Within a half mile in each of three directions from the lands in question there was a quarter section upon which a good bed of coal eight feet in thickness had been disclosed. And this the coal company had purchased from one Lees for $3,400. The lands in question, unless valuable for coal, were not worth to exceed $1.25 per acre, and yet the company willingly spent at least ten times that amount to acquire the title.

"It was hardly intending to make an aimless or grossly excessive expenditure. It was a practical concern, operated by practical men. It had located a mine upon the outcrop five years before, and in the meantime had proved

the wisdom of the undertaking by its mining operations. They had disclosed the existence of an extensive bed of valuable coal dipping to the west under the valley, and in that way had supplemented the evidence afforded by the outcrop and its surroundings."

The court summed up and closed the discussion as follows:

"An exposure to the eye of coal upon the particular lands was not essential to give them a then present value for coal mining. They were all adjacent to the outcrop and above the plane of the coal-bearing strata dipping under the valley. In alternate even-numbered sections they substantially paralleled the outcrop for seven miles, and in two places were separated from it by only a few rods. Those to the north were opposite the company's developed mine (No. 4), and those to the south were opposite the tract acquired through Lees, upon which good coal was disclosed. The outcrop, the disclosures in the vicinity, and the geological formation pointed with convincing force to a workable bed of merchantable coal extending under the valley and penetrating these lands. These conditions were open to common observation, and were such as would appeal to practical men and be relied upon by them in making investments for coal mining. They did so appeal to the Cumberland people, as well as this company, both large concerns represented by men of experience, understanding the uncertainties and hazards of the business as well as its rewards.

"It will be perceived that we are not here concerned with a mere outcropping of coal with nothing pointing persuasively to its quality, extent or value; neither are we considering other minerals whose mode of deposition and situation in the earth are so irregular or otherwise unlike coal as to require that they be dealt with along other lines."

Manifestly, a case so remotely analogous cannot be deemed to be conclusive of the issues here, especially in the light of the caution which the court took the pains to express in the closing paragraph of the opinion. The known conditions here are much further removed from the unknown, and, even were the geological occurrences comparable, the character of petroleum is such that, as we have seen, speculation as to its presence at any given place beneath the earth's surface is attended with uncertainties from which explorations for coal are free. And other considerations to which the court there attached much weight, if not wholly wanting here, are so weakened as to have but little persuasive force. Here, as there, the lands had only a nominal value; but the defendant company here was paying nothing for them. Apparently it was under the necessity of taking these lands or incurring the risk of getting nothing under its existing grant. Upon the other hand, in the coal case, so persistent was the zeal of the coal company to acquire the lands that it not only resorted to fraudulent practices to obtain them, but was willing to pay at least ten times what they were worth for any purpose other than coal. As the court points out, the evidence of valuable coal beds was of such character, and was so abundant, as to induce intelligent and practical operators, not merely to prospect for coal, but to open up coal mines, and that such was the view of the company's superintendent there could be no doubt. Though still in its employ at the time of the trial, he was not called by the company as a witness, to contradict or explain damaging statements and admissions attributed to him. Here, from the contemporary correspondence and maps and other data, and such testimony as appears to be credible touching oral statements made by different rep-

249 F.—51

resentatives of the company from time to time, we are convinced that Eberlein and the geologists, and also, it must be presumed, some of their superiors, regarded the lands as possible oil lands, and hoped that they might turn out to be such; but no one went further than to regard them as "prospecting" territory.

Certain incidents, it must be admitted, are equivocal, and are susceptible of a construction which tends to give them a sinister aspect. Chief of these perhaps is the fact that Eberlein kept most of the correspondence and papers relating to the selection in a private file—conduct which the government contends signifies a consciousness of wrongdoing. Upon the other hand, it is pointed out that he had but recently come from New York to take charge of appellant's land department, and that he found it in an unsatisfactory condition; that the business of appellant was transacted through departments; that he soon found that his views were at variance with those of the heads of other departments who were in closer touch with the local management; and that he was solicitous about his records in order that they should be available for his use in absolving himself from blame should the San Francisco management be criticized by the New York offices, as he anticipated would be the case. Both theories are plausibly supported, but neither is entirely satisfactory. Upon the one hand, it is difficult to see why he did not at once lay the matter before the New York officers, and, upon the other, if he was conscious that his records would incriminate him, we are at a loss to understand why he should have taken pains to restore and preserve them after their partial destruction in the San Francisco fire, and especially after he knew that the only outstanding copies or duplicates had been totally destroyed. So of the incident of the proposed lease of the lands belonging to the company lying near those in suit, to a subsidiary organization, for mineral exploration. In one aspect, his objection to such lease would seem to imply a knowledge or belief that the lands in question were valuable for oil, and, upon the other, he plausibly explains that in view of the known attitude of the General Land Office and the prevailing speculation as to oil in the general locality of these lands, for the appellant to lease these or other lands which it owned in close proximity, for mineral exploration, would naturally arouse a suspicion on the part of the land officials that it (the applicant) had undisclosed information that the lands were valuable for oil, which, even though without foundation in fact, would be sufficient to cause an indefinite suspension of the application for patent.

But whatever view may be taken of these incidents, manifestly neither the mental nor the moral attitude of Eberlein furnishes any substantive evidence touching the real character of the land or the controlling issue which we must decide. In this respect the case is readily distinguishable from the Diamond Coal Case, where the company's superintendent was not only personally acquainted with the lands and all their surroundings, but was well-informed upon the subject of coal mining, and competent to form an intelligent judgment. Eberlein knew nothing about oil, was never upon the lands, and personally was unfamiliar with local conditions. One of his assistants, of whom

he inquired, had a general knowledge of the lands; the company maintained other agencies for securing information touching land selections, to which, however, he seems not to have resorted. Apparently he entertained a view of the law prevailing in some quarters that the only investigation required before making application for patent was of the surface conditions upon the lands applied for. Upon recently coming to the land department of the company he found selections under the grant in arrears, and if we say that he was anxious to make selections before all the available lands were gone, that he hoped that these lands would ultimately turn out to be oil lands, that he was anxious to procure patent before there should be such development upon, or in close proximity to, them as might demonstrate that his hope was not without substance, and that he had some vague fear that other representatives of the company had information or belief inconsistent with his representations, or would take a course tending to cast discredit thereon, and compromise him, his conduct may be explained better than by any other theory which has been suggested.

It is further contended that it was generally believed in the community in 1903 and 1904 that these lands contained valuable oil deposits; some witnesses affirming and others denying the prevalence of such belief. Of course, mere popular opinion upon such a subject is of no value. As already suggested, to amount to knowledge, the "belief" must be the rational conclusion or the scientific deduction of one who is qualified by experience or learning to form an intelligent judgment. Referring to coal, for illustration, would not nine out of ten ordinary men consider an outcrop sufficient to warrant a "coal location," especially if the venture entailed only a nominal expense. The outcrop would probably engender in the ordinary man a belief in the existence of an underlying coal bed. But, as stated in the Diamond Coal Case, the belief that rests upon "a mere outcropping of coal, with nothing pointing persuasively to its quality, extent, or value," is insufficient. And inasmuch as exploration for oil is admittedly subject to greater contingencies than coal, empirical belief relative to its occurrence is correspondingly less reliable. And see the pertinent language hereinbefore quoted from Sullivan v. Iron Silver M. Co., 143 U. S. 431, 435, 436, 12 Sup. Ct. 555, 36 L. Ed. 214. Moreover, it is difficult, after the lapse of years and the change of conditions, to reproduce a faithful picture of the state of mind existing in 1903 and 1904. It is easy enough for one who shared in the optimism characterizing the oil boom of 1900 and 1901 now unconsciously to project that feeling over in 1903 and 1904, or unconsciously to relate to that period the persuasive influence of more recent discoveries, better methods of extraction, and improved marketing conditions.

Between 1904 and the time the testimony was taken, there had been a material increase in the price of oil. A railway had been extended up into the Midway valley. A government bulletin had been issued suggesting the view that oil would probably be found nearer the surface in the Elk Hills than had theretofore been thought probable. But most important of all perhaps was the striking of an enormous flow of gas in the Honolulu well in the Buena Vista Hills, at a depth of

about 1,700 feet, and the subsequent striking of oil in the same well. It is to be inferred that considerable excitement followed this discovery. The gas was encountered in July, 1909, oil in the spring of 1910, and a few months later, in December, 1910, this suit was instituted, and thereafter, in due time, the testimony was taken. Whether these and other conditions, nonexistent in 1903 and 1904, had anything to do with the commencement of the suit, it is unnecessary to inquire. It is sufficient to say that no suit was brought or testimony taken until after the conditions arose, and that consideration of such new conditions must of necessity have given a measure of color to the testimony. The outstanding and undisputed fact is that, if there was faith at all in 1903–04, it was faith without works. While development was going on in the McKittrick-Midway-Sunset belt, there was an absolute want of activity in the Elk Hills. Not only was there no expensive exploration, but locations were being permitted to lapse, and there was not even sufficient interest to induce locators to maintain their rights by the comparatively inexpensive device of relocation. Moreover, although defendant's application was pending for a year, and it embraced lands covered by numerous locations, and though notice of its pendency was given by publication, as required by the regulations of the land department, no objection was raised either by the general public or the parties interested in the oil locations. In the meantime the department had sent a special agent to make inspection, and he had reported that the lands were nonmineral. True, his examination was hasty and superficial, but there is no suggestion of fraud or bad faith upon his part. Both he and his superiors at Washington had knowledge of the fact that although the lands had, for over three years, been under suspension from agricultural entries, no serious effort was being made by any one of the numerous locators to demonstrate the existence of oil in commercial quantities or to acquire title. And under such circumstances it is perhaps not strange that they readily concluded the land was nonmineral.

Let it be granted that the market for petroleum products was low at that time, and transportation facilities meager, and that capital was conservative; the fact remains that although, by the earlier boom, the attention of the experienced and inexperienced, the informed and uninformed, all classes—capitalist·as well as promoter—had been drawn to this territory, and though in the nearby McKittrick-Midway-Sunset belt both exploration and operation were going forward, the defendant company was permitted, after public notice, to acquire a patent without opposition, protest, or question. It is difficult to reconcile such facts with the theory that it was generally believed that the lands were valuable for their petroleum content.

Without further discussion, our general conclusion is that the lands were not, in 1903–04, known to be valuable for their mineral. The conditions were such only as to suggest the probability that they contained some oil, at some depth, but nothing to point persuasively to its quality, extent, or value. Or, putting it in another way, the conditions were such as to suggest the possibility of oil in paying quantities, and to induce the more venturesome—such as were willing to take

chances—to prospect the field; but we are satisfied they were not "plainly such as to engender the belief" that any given section or other legal subdivision contained oil of such quality and quantity, and at such depth, as would render its extraction profitable. Having reached this conclusion, we deem it unnecessary to decide whether the evidence offered by the appellants touching exploration and development work within and near township 30—23, since 1904, which they contend demonstrates that the lands are not valuable for oil, is relevant for any purpose.

The decree will be reversed, with directions to dismiss the bill.

GILBERT, Circuit Judge, dissents.