UNITED STATES v. SOUTHERN PAC. CO. et al.

(District Court, N. D. California, S. D. August 28, 1919.)

Nos. 46, Civil, A–16, A–24, A–25, A–26, A–28.

1. PUBLIC LANDS ☞120—EVIDENCE INSUFFICIENT TO SHOW FRAUD IN OBTAINING RAILROAD GRANT.

Evidence *held* not to establish fraud on the part of the Southern Pacific Company in applying for and obtaining patents to lands as agricultural lands under the grant of July 27, 1866, which lands as since developed have proved more valuable for their oil content than for agriculture; it being shown that the company at once placed the lands in the market and sold the same without reservations as occasion offered at agricultural prices, and that none of the officers or agents charged with the active fraud ever acquired any individual interest therein.

2. PUBLIC LANDS ☞120—AGRICULTURAL LAND GRANT TO RAILROAD NOT AFFECTED BY SUBSEQUENT DISCOVERY OF MINERAL.

The discovery of mineral in lands patented to a railroad company under a grant of agricultural lands, after the patent, does not even pro tanto divest the title of the company, or entitle the government to cancellation of the patents, in the absence of fraud in their acquisition.

3. PUBLIC LANDS ☞120—WHEN PATENTS TO RAILROAD SUBJECT TO CANCELLATION FROM MINERAL CHARACTER OF LANDS.

To entitle the United States to cancellation of patents issued to a railroad company under a grant of agricultural lands, covering lands which were so classified in the survey, on the ground that the lands are mineral, it must appear that the known conditions at the time of the proceedings for the patents were plainly such as to engender the belief that the land contained mineral deposits of such quality and in such quantity as would render their extraction profitable and justify expenditures to that end.

In Equity. Six suits by the United States against the Southern Pacific Company and others, consolidated for trial. Decrees for defendants.

See, also, 225 Fed. 197.

E. J. Justice, J. Crawford Biggs, and Albert Schoonover, Special Asst. Attys. Gen., for the United States.

Charles R. Lewers, Henley C. Booth, and F. W. Henshaw, all of San Francisco, Cal. (W. F. Herrin, of San Francisco, Cal., of counsel), for defendant Southern Pacific Co.

BLEDSOE, District Judge. This is final hearing of the litigation considered on motion to dismiss in (D. C.) 225 Fed. 197. The actions, six in number, consolidated upon the trial, will be considered together, as the questions presented in their substantial aspects are unitary.

The suits seek to cancel, as for fraud, certain patents issued by the government to the Southern Pacific Railroad Company in pursuance of the act of Congress approved July 27, 1866, "granting lands to aid in the construction of a railroad and telegraph line from the states of Missouri and Arkansas to the Pacific Coast" (14 Stat. 292, c. 278), as modified by the joint resolution of Congress of June 28, 1870 (16 Stat. 382, No. 87). The litigation, in its general aspect, is the parallel of that considered by the Circuit Court of Appeals for this Circuit in United

States v. Southern Pacific Co., 249 Fed. 785, 162 C. C. A. 19, commonly referred to as the Elk Hills Case, in the course of which opinion may be found a recital of some of the general and controlling features of the situation.

The suits herein name no less than 234 defendants, and it is asserted by defendants that 111 other persons claim interests in the lands involved and are "necessary parties" in consequence. The litigation directly challenges the title to approximately 165,000 acres of land in the "oil territory" of the west side of the San Joaquin Valley, extending from above Coalinga on the north to below Sunset on the south. The value of the land actually involved is alleged by the government in its complaints to be in excess of $421,000,000. The patents in issue aggregate 16. The first, No. 20, covering some 4,000 acres, was applied for by the railroad company in 1883, and was finally issued in 1892. Suit was brought upon it in January, 1915. Patent No. 22, covering over 60,000 acres, was applied for in May, 1892, issued July 10, 1894, and suit was brought, the earliest one filed, December 20, 1912. The other patents involved were applied for at various times between 1882 and 1900, and were issued at various dates between 1894 and 1902. It might be said, in passing, that the patent applied for in 1900, and the only one herein involved applied for after 1897, was issued in 1902, and covers 3 sections of land in the Elk Hills region, none of which as yet are shown to be oil-bearing.

During the course of the protracted hearings, many hundreds of witnesses were examined in open court, and nearly 15,000 pages of testimony thus taken. The importance and magnitude of the property rights involved have at no time been lost sight of by the court. A careful consideration of the evidence, and of the various contentions of the principal parties to the litigation, has, of course, been given. Due regard for economy, both of time and of space, however, demand that the conclusions of the court be stated with brevity.

As is set forth in the Elk Hills decision, supra, pursuant to the terms of the railroad grant, and in consequence of certain regulations promulgated by the Department of the Interior, having charge of the disposition of public lands, it was required that the railroad company, in making application for the issuance of patent to its granted lands, should cause its land agent, duly authorized in such behalf, to make affidavit that he had caused the lands applied for "to be carefully examined by the agents and employés of the company as to their mineral or agricultural character, and that to the *best of his knowledge and belief* none of the lands returned in the list are mineral lands." 19 L. D. 21. (Italics supplied.)

Jerome Madden, during all of the time mentioned herein, was the land agent of defendant company, the predecessor of C. W. Eberlein, referred to in the Elk Hills decision, supra. It is alleged in the bills of complaint, as set out more fully in the opinion on the motion to dismiss (225 Fed. 197, supra), that Madden made and transmitted the requisite affidavit, containing the positive statement that the lands applied for were "not interdicted mineral or reserved lands, and are of the character contemplated by the grant." It is then averred, at some

length, that the lands now are, and at all times mentioned were, mineral lands, without the terms of the grant; that they were so known to be by the railroad company, and by Madden in particular, "long prior" to the making of the affidavit referred to; that nevertheless, in ignorance of the truth, and in complete reliance upon the false representations sworn to by Madden in his affidavit, etc., the Secretary of the Interior was led to and did cause to be issued the patent, etc. It is also alleged, it may be added, that the fraud thus perpetrated was not only "naturally self-concealing," but was in fact, through the machinations of the railroad company and its agents, actually concealed from the government and all of its responsible officers until 1910, when certain suits were brought in this court, etc., referring, inter alia, to Burke v. Southern Pacific Co., 234 U. S. 669, 34 Sup. Ct. 907, 58 L. Ed. 1527.

The defendant railroad company denies with positiveness and unequivocation the intention to commit, or the actual commission, or the subsequent concealment, naturally or otherwise, of any fraud in the premises. In addition and specially, laches and the bar of the statutes of limitation (Act March 3, 1891, c. 559, 26 Stat. 1093 [Comp. St. § 4992], and Act March 2, 1896, c. 39, 29 Stat. 42 [Comp. St. § 4901–4903]), are set up as defense.

Stripped to the core, the claim of the government is that the defendant company, knowing the lands were mineral, and that therefore it was not entitled to them, nevertheless deliberately conceived and put into successful operation the fraudulent plan of acquiring such lands to its own use and benefit, and in complete disregard of the government's rights. The case, as developed by the government on the hearing and through the contentions of its counsel, is to the effect that the "Big Four" of the Central and Southern Pacific Companies, the original initiators of that great unified enterprise (Stanford, Crocker, Huntington, and Hopkins), together with several lesser lights, occupying positions of responsibility and prominence, however (Towne, general manager, Madden, land agent, Kruttschnitt, vice president, etc.), were all parties to a deliberate, long-enduring, and wide-embracing scheme to acquire from the government wrongfully vast areas lying on the west side of the San Joaquin Valley, involving some of the richest oil lands that the world has ever known; that this scheme was conceived sometime in the '70's, or possibly early '80's, and continued to flourish uninterruptedly, but all the time concealed, either naturally or through the artifices of its instigators, until its accidental discovery by the government through the filing of the Burke suit in 1910; in other words, that through a period of say 30 years some of the most prominent, most forceful, most far-seeing men that our state has produced, were engaged in the diabolical plan of consummating one of the greatest frauds of the age; and not only that, but that during the course of the perpetration of that fraud, and previous to the realization of any appreciable profit or substantial reward from its attempted consummation, practically all the original parties to the gigantic conspiracy had gone to their graves. It seems hardly within the realm of possibility that such could be the case, and I feel sure that the requisite proof of

such an enormity, "by that class of evidence which commands respect and that amount of it which produces conviction" (Diamond Coal & Coke Co. v. United States, 233 U. S. 236, 239, 34 Sup. Ct. 507, 508, 58 L. Ed. 936), has not been adduced herein.

It is to be observed at the outset, for I conceive it to be a matter of primal importance, that the defendant railroad company was in no sense a mere self-seeking applicant for the lands in question. It occupied a *status* much higher than that of a mere homesteader or preemptioner. Pursuant to acceptance of a definite and far-reaching offer on the part of the government for the construction of the railroad, it became entitled as a matter of right, and not of grace, to the ownership, possession, and enjoyment of every odd section, "not mineral," or not otherwise appropriated, on either side of its line of road, within certain stated primary and indemnity limits. Burke v. S. P. Co., 234 U. S. 669, 680, 34 Sup. Ct. 907, 58 L. Ed. 1527. The defendant company is not, therefore, to be considerd an object of suspicion because it applied for these particular lands. In due course it was its duty to apply for them, unless they were "mineral" or appropriated. It could not be deprived of them unless they were mineral or otherwise appropriated. Seemingly, in so far as I can determine from the record, all lands involved herein were returned by the government surveyed as agricultural; i. e., "nonmineral," and in consequence there was a prima facie showing, sufficient at least to cast the burden of proof upon a possible objector, to the effect that the lands were of the sort and kind contemplated by the grant. Tulare Oil Co. v. S. P. Co., 29 L. D. 269.

I advert to this situation, because I think it distinguishes this case, on the facts, from many other fraud cases, and particularly from the Diamond Coal & Coke Case, supra. Presumptively, all the railroad company was intending to do, in making application for these lands, was to become possessed of its own; no ulterior motive may be inferred from the mere making of the application, or subsequent claim of the lands.

The government has relied (1) upon certain information, said to have been conveyed to the parties mentioned hereinabove, or to others acting for them, to the effect that the lands were mineral lands; and (2) upon the presence of certain natural phenomena (live oil seepages, shale and oil sand outcrops, and the like), the observation of which, it is strenuously asserted, could have had no other effect than to cause defendant's agents and officers to be of "the belief that the land contained mineral deposits of such quality and in such quantity as would render their extraction profitable and justify expenditures to that end" (Diamond Coal & Coke Co., supra)—i. e., that the lands were "mineral lands," as that term was known to the law.

With respect to the information said to have been conveyed to various railroad officials regarding the mineral character of the land, without specifying the particular witnesses testifying thereto, it may be said, without exception or qualification, that every statement relied upon by the government in that particular behalf is shown to have been made to an individual *deceased at the time of the trial*. It

is as obvious as it is long established that the weakest evidence that can be offered in a court of justice is evidence of an asserted conversation had with one no longer living. The lips of the unreplying dead are unavailable for rebuttal; no skill in cross-examination can adequately serve to dissect out the true from the false. The statement must, perforce, rest upon the bare word of the party testifying to it; and a due regard for the rights of property and the value of reputation would seem inexorably to demand that, before a judgment should issue upon such skeleton of fact, it should be supported in corroborative circumstance by such proof at least as to make its acceptance conscionable. Such corroborative proof is not only wanting in these cases, but on the other hand, patent and irrefutable facts point to a contrary conclusion.

In the first place, circumstantial verity is lacking in some of the narratives themselves. Improbability of some occurrences, as asseverated, confronts even the credulous mind. Inconsistency of utterance and conduct induces a rational disbelief; and on more than one occasion a positive contradiction, coming from unimpeached and apparently unimpeachable sources, serves completely to annihilate the seeming truth of the assertion.

When all of the foregoing is said in this behalf, however, there still remains that which, to my mind, constitutes incontrovertible refutation of the claim that the officials and agents of the railroad company knew, at all the times involved, that the lands in question were "mineral lands"; i. e., "more valuable" for their mineral content than for their agricultural possibilities. Barden v. Northern Pacific R. R., 154 U. S. 288, 328, 14 Sup. Ct. 1030, 38 L. Ed. 992; Davis v. Weibbold, 139 U. S. 507, 523, 11 Sup. Ct. 628, 35 L. Ed. 238. I refer to the conduct of the officials and agents themselves respecting such lands.

If the officials of the railroad company knew that these lands were more valuable for their mineral than for their agricultural possibilities when they acquired them, as is charged by the government and as its evidence undoubtedly tends to show, then they were guilty of a colossal fraud, of course, and they and their successors should now be mulcted of their ill-gotten gains. To hold them possessed of such knowledge, however, and therefore guilty of such fraud, it must be found or inferred that they intended to advantage or benefit themselves. The conception and perpetration of a fraud inevitably involves an intent unlawfully to benefit from the fraudulent transaction. The same self-interest which would inspire the fraud would seek material satisfaction in an appropriation of its fruits; and if men handle valuable property as if it had no or but little value it is almost proof positive that they are unacquainted with and have no suspicion of its real value.

Both prior, and subsequent, to the actual acquisition of some of the most valuable of the lands patented to the railroad company in the oil belt, in suit and otherwise, the company, in due course, with insistent effort and patient forbearance, made contracts for the sale of, and actually sold, these lands at mere grazing or cheap agricultural prices— from $2.50, in most instances, to $10.00 an acre. On one section, 17,

situate above Coalinga, and containing probably the then most persuasive geological and physical indications of any lands in that neighborhood, an unusually "stiff price" was put on the lands, because the land grader's "summer vacation was spoiled" in consequence of his having to appraise the land right after the application to purchase, and it was sold for $3.50 and $5 per acre. The witness Hart testified that he assured C. P. Huntington, in New York, in 1893, that "the railroad oil lands were worth more than his entire railroad." Yet, sedulously and persistently, after it is claimed such a startling statement was made to its president, the railroad company continued to offer and sell its lands to whomsoever would buy at mere grazing and agricultural prices. Lands in the Kreyenhagen Hills, Lost Hills, and Kettleman Hills, all promising oil territory according to the geologists, were thus sold, and held for sale, without reserve.

[1] During all these years, and to and until the great discoveries of oil in the Kern River field and in the McKittrick field, in 1899 and thereafter, while the railroad company was indulging in strenuous efforts to provide itself with the necessary fuel for its engines, first with coal and then later, beginning about 1897, with oil, the fact is that it was either disposing of, or offering to dispose of, at the merest fractional part of their value, lands actually containing the very fuel of which it was then so industriously in search. In addition, the men at the head of the Southern Pacific and its subsidiary corporations at that time, admittedly possessed of unusual business acumen, failed in a single instance, to which the court's attention has been directed, to become individually possessed of a single foot of producing or probable oil territory within the area in suit. Some of them at least, charged with either participation in, or knowledge of, the conspiracy, did purchase granted lands, and it is inconceivable that if they had known, or even suspected, the truth with respect to the oil content of the west side lands, they would not have reduced at least some of them to personal possession.

I repeat, as demonstrative of the unsoundness of the government's claim in this particular behalf, that self-interest alone—thievish self-interest—would have prompted the perpetration of the fraud alleged. The same or a continuing self-interest would have prompted the retention of at least some substantial portion of the real value of the thing acquired. Having sold, or offered generally to sell, all these lands for a mere pittance, considering their "mineral value," it is inconceivable that the same men should have perjured themselves originally in order to accomplish their acquisition. Their conduct is more consistent with honesty of purpose and bona fides of belief than with fraud and chicanery. The whole state of the record, viewed with unprejudiced eye, fails in my judgment to induce the conclusion that the proof of the fraud asserted is "clear, convincing, and unambiguous." Colorado Coal Co. v. United States, 123 U. S. 307, 8 Sup. Ct. 131, 31 L. Ed. 182. In the absence of such degree of proof, "by that class of evidence which commands respect," the plain and instant duty of the court is to deny the relief requested.

[2] At this point attention should be called to the fact that it is not

the actual presence or subsequent discovery of oil in the lands in question which gives the government the right to recover herein. Pursuant to apparently due and regular proceedings, in accordance with law, the government has heretofore granted these lands to defendant company. Though the company was not entitled to receive "mineral lands," yet it is definitely established that a discovery of mineral in the lands, after patent, will not suffice, even pro tanto, to divest the railroad title. It is only when "fraud" has been perpetrated in the acquisition of the lands that the patent may be set aside. "When the legal title did pass—and it passed unquestionably by the patent—it passed free from the contingency of future discovery of minerals." Burke v. Southern Pacific Co., supra. "If at that time [time of proceedings taken to secure patent] the land was not thus known to be valuable for mineral, subsequent discoveries will not affect the patent." Diamond Coal & Coke Co., supra.

The government, however, insists that the fraud complained of may arise from the assertion of that as a fact which the party did not know to be true (Pomeroy, Eq. Jur. § 885), when he "ought to have known" of its falsity (Bigelow on Fraud, vol. 1, p. 8), or had "no reasonable grounds" for believing it to be true (Southern Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678). It then contends that the proper study and investigation of the physical aspects of the lands in question, required in order that the affidavit of "nonmineral" character might be made and presented, would indubitably (and therefore must) have caused the company, through its agents and investigators, to become apprised of the mineral character (oil content) of such lands.

It is sufficient, with respect to what the company actually did learn and believe as to the mineral value of the land, to refer to what has already been said concerning its conduct. From its long-continued handling of these lands, it must be held that it did not know their actual or potential value as oil lands, irrespective of the sources from which information is said to have come. But may we assert now that it "should have known," and that, because of its negligence or incredulity in this behalf, the lands now may be taken from it in virtue of the established "mineral value" of at least a part of them?

[3] The keystone of the entire arch of the government's syllogistic structure is the holding of the Supreme Court of the United States in the Diamond Coal & Coke Co. Case, 233 U. S. 239, 240, 34 Sup. Ct. 507, 509 (58 L. Ed. 936), supra, to the effect that, in a suit to cancel an agricultural patent for fraud, it will suffice if it be made to appear "at the time of the proceedings which resulted in the patent the land was known to be valuable for mineral; that is to say, it must appear that the known conditions at the time of those proceedings were plainly such as to engender the belief that the land contained mineral deposits of such quality and in such quantity as would render their extraction profitable and justify expenditures to that end."

That case concerned the attempt of a coal company, long engaged in the business of coal mining in the particular neighborhood in question, to acquire unlawfully and fraudulently, under agricultural en-

tries, certain lands known and believed by it to be coal lands. The difference in "mode of deposition" between coal (especially adverted to in the Diamond Coal Case, 233 U. S. 249, 34 Sup. Ct. 507, 58 L. Ed. 936, supra) and oil is not only apparent to those learned in the science of geology, but has received express consideration in the Elk Hills decision, 249 Fed. 799, 162 C. C. A. 19, supra, in connection with that court's analysis of the Diamond Coal Co. Case. In addition to what is quoted therein from the testimony of Dr. Branner, he testified in the present case that:

"We know that coal, when it forms, stays right where it is placed. * * * But in the case of petroleum, no matter where it originates, it is always trying to get away from there and go somewhere else."

Too little attention has been paid to the important word "plainly," found in the declaration of the law quoted from the Diamond Coal Co. Case. In my judgment, it is only by giving that word its appropriate emphasis and consideration that the decision does not constitute a radical departure from previous conclusions announced by the same court, and referred to and relied upon therein. Diamond Coal Co. Case, supra, 233 U. S. 240, 34 Sup. Ct. 507, 58 L. Ed. 936.

If, then, we assume the true rule to be that the "known conditions" must be such as "plainly" to engender the "belief" that the land contained mineral deposits of such quality and in such quantity as would render their extraction profitable and "justify" expenditures to that end, my conclusion is that not only did the railroad officials fail to have the requisite "belief," but that the then "known conditions" were not calculated, and did not serve, "plainly" to engender such belief.

It must be remembered, as already adverted to, that all these lands, except three sections lying on the flank of the Elk Hills, were acquired by patents issued in the period between July 10, 1894, and December 2, 1897. Though there was some oil produced in and about Coalinga in 1896, the real "boom" in the fields occurred after the Kern River discovery in 1899. That discovery, marvelous in its nature, attracted great numbers of people to all "possible oil territory," and every "indication," insignificant or otherwise, as well as countless acres of outlying and "wildcat" territory, became the subject of consideration and "location"; i. e., the posting thereon of "mineral location notices," but with no precedent or concomitant "discovery." See United States v. McCutcheon (D. C.) 238 Fed. 575. All this, however, it must be remembered, occurred after all the patents, except No. 111, the subject of suit A–24, had been issued by the government.

The truth is that, though on the west side of the San Joaquin Valley, even from the '60's, there had been occasional, sporadic, and almost without exception commercially unsuccessful efforts to secure oil, maltha, and asphaltum, yet it remained for the Kern River excitement and the consequent McKittrick discoveries in 1899 and 1900, to put the oil industry of that region upon the solid footing that it possesses to-day. Early oil men, lacking greatly in experience, in initiative, in willingness to assume unwarranted risks, clung to the outcrops and territory more or less immediately adjacent, and did not go down into the "plains," where most of the lands involved herein and nearly

all of the really "rich oil territory" are situate. Under such circumstances, in my judgment, the action of the railroad company in making application for the legal title to lands which, in a sense at least, it was then equitably entitled to, is not to be considered as violative, consciously or unconsciously, of the law as laid down in the Diamond Coal Co. Case.

It should be observed again, for emphasis, that the railroad company was entitled, in virtue of a "contractual" obligation (Burke v. Southern Pacific Co., supra) wholly performed as to it, to the receipt of the legal title to these lands, except such of them as might be "mineral" or "otherwise appropriated." They had been returned by government surveyors as "nonmineral." All proceedings taken looking to their formal acquisition by the railroad company were had and taken in due course and in accordance with the existing requirements of law, as laid down by the Interior Department, and the usual publicity, by advertisement in newspapers and otherwise, was accorded.

No objection to the patenting of any of these lands on the score of their mineral content was made by anybody, in so far as I can determine, save a "blanket objection" made by one Benjamin, and passed upon in due course, adversely to his contention, by the Department of the Interior, and an objection made by the Tulare Land & Oil Company, carefully considered and allowed in part and denied in part. Tulare Oil Co. v. S. P. Co., supra. None of the lands covered by the Tulare decision, it may be said, are involved herein.

It thus appears that though, with respect to the lands applied for and awarded to the railroad company, and in suit here, the "oil people" had notice of what was going on, yet no showing was made, at the time, by anybody, to the effect that the lands were oil lands and not patentable. This to my mind is demonstrative that, at the time of their acquisition, the "known conditions" were not such as "plainly" to "engender" the "belief" that expenditures in search of oil therein would be "justified."

It must be remembered that the controlling test is, not that incautious and irresponsible individuals would be "willing" to take a chance and explore for oil, but that the conditions "should be such as would *justify* a man of ordinary prudence, not necessarily a skilled miner, in the expenditure of his time and money." Chrisman v. Miller, 197 U. S. 313, 322, 25 Sup. Ct. 468, 471, 49 L. Ed. 770. If there were such men on the west side of the San Joaquin Valley, at the time proceedings for patent were pending, so disposed with respect to lands involved in these suits, why did they not appear and contest the railroad's claim to these lands? Why were they not then, as they have been in great numbers since 1899–1900, actually engaged in giving practical expression to their "belief," engendered by an observance of the "known conditions"? There is a homely proverb to the effect that "The proof of the pudding is in the eating." It may lack authoritativeness herein, but it is surely not without appositeness.

I am not inadvertent to the fact, of course, that the mere absence either of explorative efforts at the time, or asserted objection before the Interior Department, is not conclusive herein. It is peculiarly per-

suasive, however. Neither do I overlook the government's repeated contention that such explorative efforts, actually being carried on, within regional or even in some cases contiguous properties, taken in connection with observable physical and geological conditions, should have suffhiced to "engender the belief" required. In the then state of the art of oil seeking, oil drilling and oil finding, however, I am constrained to conclude that this is a fallacious assumption. We must test men's minds as to being "justified" in the entertaining of "beliefs" from "known conditions," by a reference to the state of the art and the state of knowledge and experience and ability to drill for oil, as the same existed prior to patent, previous to 1899, and not as these factors or any of them exist to-day.

It is very easy, of course, for an eminent and scholarly geologist like Dr. Branner, of Stanford University, a man of unusual ripeness and maturity in science, to say that, if he had been asked in 1892, he would then have said that he felt it "his professional duty" to his client to include all lands involved herein, among others, as "probable oil lands"—"warranting the expenditure of money necessary to develop them with the reasonable expectation of their yielding oil." It is a very different matter, however, for this court now to say that such expression of opinion, coming even from such an acknowledged scientific authority, would, in the then practical state of the art, have "justified" (not merely made "willing") men "of ordinary prudence" in the "expenditure of their time and money" (Chrisman v. Miller, supra) in the drilling of any particular section or tract of this land, or even at all; and yet that is what this court would have to say, with respect to each and every individual government subdivision, before it could righteously and justly award the government a decree covering such subdivision.

The lands above referred to, lying in the Elk Hills, are subject, in the main, to the observations just indulged in. They were patented after the Kern River and McKittrick discoveries, but lie in such relation to them, and their succeeding history has been such, as to justify the general conclusion reached and detailed hereinabove.

Many matters of asserted moment, looking to the question of the existence of actual fraud, but occurring subsequent to the issuance of patent, have been introduced in evidence, as, for instance, the testimony in the Elk Hills Case, supra, etc. Having concluded that no fraud was committed by the railroad company in its acquisition of these lands originally, it is irrelevant now to enter into a close analysis of the conduct of some of its employés subsequent to that time. It might be suggested that the most serious challenge with respect to its good faith centers about the conduct of its land agent, Eberlein, in 1903 and 1904, and as to that the decision in the Elk Hills Case, supra, seems to be opposed to any conscious wrongdoing on his part.

Judge Van Fleet, now of this circuit, and formerly of the Supreme Court of California, when upon that bench, said in Truett v. Onderdonk, 120 Cal. 581, 588, 53 Pac. 26, 29:

"The presumption is always against fraud, a presumption approximating in strength to that of innocence of crime."

It is my deliberate and carefully formulated opinion that such presumption has in no wise been met or overcome in these cases. Counsel for defendants will present, and the court will sign, appropriate decrees of dismissal